**FAME PUBLISHING CO., INC., et al.,**
**Plaintiffs-Appellees,**

v.

**ALABAMA CUSTOM TAPE, INC., et al., Defendants-Appellants.**

No. 74–1200.

United States Court of Appeals, Fifth Circuit.

Jan. 31, 1975.

---

F. Dulin Kelly, Hendersonville, Tenn., Robert L. Estes, Nashville, Tenn., for defendants-appellants.

W. Michael Atchison, Birmingham, Ala., John S. Clark, New York City, Arnold Teks, Florence, Ala., Sidney S. Rosdeitcher, Steven B. Rosenfeld, New York City, for plaintiffs-appellees.

Before GODBOLD and MORGAN, Circuit Judges, and BOOTLE, District Judge.

LEWIS R. MORGAN, Circuit Judge.

Although defendants-appellants are popularly known as "tape pirates" they could more accurately be described as "tape parasites." When it becomes apparent that a recording of a composition copyrighted by one of plaintiffs-appellees is destined to become a "hit," appellants purchase a copy of the recording, reproduce it hundreds of thousands or millions of times, and sell the copies to the public. While most record producers face substantial risks and expenses, never knowing whether their efforts will succeed, appellants encounter no such problems; they buy their hits for a song.

■ In this action by music publishers [1] for copyright infringement,

---

1. The dissent maintains that plaintiffs-appellees lack standing under the tests of Association of Data Processing Service Organizations v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) and Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Data Processing's two-pronged test is met here. First, plaintiffs alleged "injury in fact." Each plaintiff music publishing company alleged specific violations of its copyrights in specific musical compositions (Complaint paragraphs 15–114) and asked for an injunction against and damages for each such infringement (Prayer for Relief, paragraphs one and two). In paragraph four of their complaint, they alleged:

> Such bootleg tape cartridges [produced by defendants] are sold . . . for cash at prices substantially lower than the prices of legitimate tape cartridges, to the material detriment of the recording artists, recording companies, *music publishers* and song writers, and to the great damage or retail merchants engaged in the sale of legitimate recordings. (Emphasis supplied.)

We note, finally, that the *Data Processing* plaintiffs, who were held to have standing, alleged only prospective economic injury while plaintiffs here allege they have already been injured.

Clearly, plaintiffs also meet the second prong of *Data Processing's* test, "whether the interest sought to be protected . . . is arguably within the zone of interests to be protected or regulated by the statute . . . ". Association of Data Processing Service Organizations v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184. Here the interest sought to be protected was created by the statute in question, 17 U.S.C. § 1; there can therefore be no serious argument that the "interest" which plaintiffs seek to protect, their copyrights in the compositions, are not within the "zone of interests to be protected."

The dissent's reliance on *Sierra Club* is inapposite, since that case dealt with the question of "what must be alleged by persons who claim injury of a noneconomic nature . . . ". Sierra Club v. Morton, 405 U.S. 727, 734, 92 S.Ct 1361, 1366, 31 L.Ed.2d 636 (1972). However, even under *Sierra Club's* requirement that "the party seeking review be himself among the injured" id. p. 735, 92 S.Ct. p. 1366, plaintiffs clearly have standing, since they allege economic injury to their music publishing businesses. *Sierra Club* does not challenge the proposition that "palpable economic injuries have long been recognized as sufficient to lay the basis for

the district court granted their motion for summary judgment and permanently enjoined defendants from continued infringement of plaintiffs' copyrights in musical compositions. For reasons developed below, we affirm the district court.

## I. THE COPYRIGHT ACT

Appellants' principal contention is that their activity is protected under the "compulsory license provision" of the Copyright Act of 1909, 17 U.S.C. § 1(e). Congress therein granted the holders of the copyright in a musical work the exclusive right

> . . . to make any arrangement or setting of it or of the melody of it in any system of notation or any form of record in which the thought of an author may be recorded and from which it may be read or reproduced . ..

Plaintiffs, independent music publishers, may refuse to allow their copyrighted works, in the form of "sheet music," ever to be recorded at all. If they do grant such permission, however, the compulsory license provision automatically applies, stipulating

> . . . as a condition of extending the copyright control to such mechanical reproductions, that whenever the owner of a musical copyright has used or permitted or knowingly acquiesced in the use of the copyrighted work upon the parts of instruments serving to reproduce mechanically the musical work, any other person may make similar use of the copyrighted work upon the payment to the copyright proprietor of a royalty of 2 cents on each such part manufactured, to be paid by the manufacturer thereof. . . .

In the majority of cases, this means that once a composition has been recorded, other artists must be allowed to make a recording of their performance of it. Appellants, of course, simply re-record the first recording. The precise issue for decision is therefore whether duplicating a sound recording of a performance of a copyrighted composition is a "use" of the composition "similar" to the original recording of it.

As a preface to our analysis, it may be helpful to emphasize that the copyrights here involved are in the musical compositions themselves, not the particular recorded performances. These rights have been protected by federal law since 1909; no federal law provided for copyright protection of a particular performance until 1971. See our discussion of the "Sound Recording Amendment of 1971" at (c) *infra*.

(a) *The statutory language.* The Act provides that, after the first mechanical recording of a composition, others may make "similar use" of the composition, upon the payment of two cents per recording. The first recording is made, of necessity, from a live performance; it involves, in varying degrees depending on the nature of the composition, singers, instrumentalists, arrangers, and conductors. The "use" of the composition thus consists of a process (a live performance) as well as a product (a recording); neither one by itself is sufficient to constitute the "use" being licensed.

A taped duplicate is simply not a "similar use" of the composition as we understand the words. There is no live performance; in fact, there are no musicians at all. Only a tape recorder is required. The end product, of course, is

standing, with or without a specific statutory provision . . . ". *Id.* pp. 733–734, 92 S.Ct. p. 1365.

The dissent argues that plaintiffs cannot have been injured since defendants tendered the two cent statutory royalty for each reproduction. This analysis overlooks the fact that the compulsory license provision is an exception to the general prohibition against duplication. The central issue in this case is whether defendants made "similar use" of

plaintiffs' compositions; only if they did are they permitted to tender the royalty and entitled to be licensed. The dissent, in asserting that defendants are entitled to tender the statutory royalty, assumes of necessity that they are within the compulsory license exception, i. e., that duplication is a "similar use." But this is precisely the issue for decision, one which cannot be disposed of with such legal legerdemain.

not only "similar" but virtually indistinguishable; the process, however, is completely dissimilar. This distinction is not mere musical metaphysics; it is the dividing line between that which the statute commands and that which it forbids. Although appellants "produce" recordings, they do not make a "similar use" of appellees' compositions in so doing.

(b) *Congressional intent.* We need not rest our holding solely on the plain meaning of the statute, however; the general policy of the Copyright Act reinforces our conclusion. We begin by noting that the compulsory license provision is a limited exception to the copyright holder's exclusive right to decide who shall make use of his composition. As such, it must be construed narrowly, lest the exception destroy, rather than prove, the rule. Thus we should neither expand the scope of the compulsory license provision beyond what Congress intended in 1909, nor interpret it in such a way as to frustrate that purpose.

Congressional intent was apparently twofold: to encourage future creative endeavor and to combat monopolization in the music industry. H.R.Rep.No.2222, 60th Cong., 2d Sess. (1909). *See* Goldstein v. California, 412 U.S. 546, 565, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973). The compulsory licensing provision was an ingenious device for the accomplishment of these objectives: the artist is left free to choose the manner in which his composition will initially be offered to the public, yet he must then license others who wish to present their own competing renditions.

It is incontestable that protecting tape duplication would frustrate rather than further these objectives. First, far from encouraging artistic creativity, such statutory protection would have precisely the opposite effect.

For several obvious reasons, duplication is far less expensive than the more traditional method of producing a popular recording. The duplicator need not exert himself in finding and developing the artist, nor need he bear the actual costs of recording the composition and promoting the finished product. It is apparent then that if duplicators are allowed to operate, they will. As a result, there would be fewer new interpretations of hit records, either by established artists or by "unknowns." A related result would be that fewer new artists would be afforded the opportunity to record their own work. The aspiring artist would be caught in a two-way squeeze; the duplicators, of course, would have no interest in financing his shot at stardom, while recording companies, their profits cut by duplicators, would be able to take far fewer chances on untested talent. As a result, fewer people could realistically consider commercial music as a way to earn a livelihood; artistic endeavor would inevitably be curtailed. Naturally, plaintiffs' businesses would suffer since there would be fewer compositions to publish.

Second, protecting duplication through the compulsory licensing provision would promote rather than inhibit the growth of monopoly in the recording industry. As the Register of Copyrights testified in connection with the 1971 amendment to the Copyright Act:

> The record industry, taken as a whole, is a highly competitive industry. There is ease of entry; there are a lot of small companies.
>
> If someone can come in and legally skim off the hits, who is going to suffer, the small company or the larger company? Hearings on S. 646 and H.R. 6927 Before Subcomm. No. 3 of the House Comm. on the Judiciary, 92d Cong. 1st Sess. 20 (1971).

The answer is obvious, of course. Only the largest producers could afford to suffer the losses inflicted by duplicators.

(c) *Judicial authority.* The issue before this court has been raised infrequently, due to its relatively recent genesis. In fact, only two Courts of Appeals have considered the question; both have held precisely as we do that duplication is not protected by the statute. The Ninth Circuit, in Duchess Music Cor-

poration v. Stern, 458 F.2d 1305, 1311 (9th Cir. 1972), concluded:

> Rosner may, of course, record appellants' songs, when she hires musicians, artists, and technicians. Instead, she steals the genius and talent of others. She deceives others into thinking that her tapes represent her own work. She has no "right to copy." . . . She may not continue her piracy under the flag of compulsory licensing. (Citation omitted.)

Appellants attempt to distinguish *Duchess* on the grounds that Rosner, the duplicator there, did not tender the two cent royalty until after she had been "caught red-handed" in her copying. It is, of course, precisely because she attempted to comply with the compulsory license provision that the question arose; we cannot see that the timing of her tender changes or taints the issue.

Edward B. Marks Music Corporation v. Colorado Magnetics, Inc., 497 F.2d 285 (10th Cir. 1974) (en banc) arises from a factual setting even more similar to ours, in that defendant's method of operation included from the beginning a tender of "royalties" which plaintiffs refused. There the court concluded that the compulsory license provision means that once Marks has licensed one recording,

> Magnetics may make its own arrangements, hire its own musicians and artists, and then record. It does not mean that Magnetics may use the composer's copyrighted work by duplicating and copying the record of a licensed recording company. Such, in our view, is not a *similar* use. 497 F.2d 285, 288.

*Duchess* and *Marks* in turn find support in Aeolian Company v. Royal Music Roll Company, 196 F. 926 (W.D.N.Y.1912), the initial decision construing the compulsory license provision. The court there held that duplicating a player piano roll, that era's analogue of a sound recording, was not a "use" of the composition "similar" to making the original roll, and was therefore not protected by the statute.

Finally, in Fame Publishing Company, Inc. v. S & S Distributors, Inc., 363 F.Supp. 984 (N.D.Ala.1973), the court likewise concluded that the provision offers no protection to duplicators.

Against this impressive battery of judicial authority, appellants offer as their principal weapon Jondora Music Publishing Company v. Melody Recordings, Inc., 351 F.Supp. 572 (D.N.J.1972). In holding that duplication is a "similar use" protected by the statute, that court committed one of the most basic of legal errors: by asking the wrong question, it got the wrong answer. Rather than asking whether duplicating a recording is a "similar use" of the composition, it asked whether recorded performances are protected by the Copyright Act. This fallacy is most clearly illustrated in the court's analysis of *Duchess*:

> . . . that court [9th Circuit] believed that because a musical composition is copyrighted, the unauthorized reproduction of the *performance* embodied in the sound recording of that composition is, and ought to be, prohibited by federal copyright laws. But that clearly was not the law when *Duchess* was decided. *Neither performance nor recording was copyrightable.* 351 F.Supp. 572, 580 (emphasis supplied).

Of course, the *Duchess* court was not concerned with the recording or performance but with infringement of the copyright in the composition itself. The district court simply could not distinguish form (the recording) from substance (the composition).[2]

---

2. The dissent follows this same reasoning in its reliance on *Jondora* and Goldstein v. California, 412 U.S. 546, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973). In fact, the passage from *Jondora* chosen for quotation by the dissent is one which reveals that court's misconception of the underlying issue, since it concerns copyright protection of "mechanical recordings."

The dissent correctly cites *Goldstein* for the proposition that Congress had not acted in the area of copyright protection of sound recordings fixed before the effective date of the 1971 amendment. We agree completely, but again, this does not advance our inquiry since the issue of copyright protection for sound recordings is simply not involved in this case.

Not surprisingly, this approach lead the district court into conceptual cul de sacs such as the legislative history of the "Sound Recording Amendment of 1971," (Public Law 92–140, 85 Stat. 391). That amendment created a copyright in sound recordings "fixed" after February 15, 1972; again, the court's concern with this amendment illustrates its misconception that the underlying issue concerned particular recordings rather than the compositions themselves. In examining the legislative history of the amendment, the court unearthed numerous statements to the effect that "tape piracy" was not prohibited by federal law. The court concluded that since no copyrights existed in recordings "fixed" before the effective date of the statute, duplication was therefore legal.

■ Aside from noting the basic analytical confusion embodied in reliance on this amendment, two other criticisms may be made. First, neither the district court nor this court is bound by rather impressionistic statements in a legislative history as to what a prior existing law means. Especially is this true when, as here, a great deal of time (63 years) has elapsed between the two Congresses involved. "[T]he views of one Congress as to the construction of a statute adopted many years before by another Congress have 'very little, if any, significance.'" United States v. Southwestern Cable Company, 392 U.S. 157, 170, 88 S.Ct. 1994, 2001, 20 L.Ed.2d 1001 (1968) (citation omitted). It should be readily apparent that a more accurate guide to Congressional intent is the legislative history of the 1909 Act itself; as we have seen, that history indicates that the dual purposes of the Act would be thwarted by extending its protection to duplication.

Second, the Congress reached its conclusion despite a dearth of judicial interpretation; no Court of Appeals had spoken on the issue at the time the amendment was being considered.

Based, therefore, on our analysis of statutory language, Congressional intent, policy considerations, and prior judicial authority, we can only conclude that appellants' acts do not fit within the compulsory license provision.

## II. THE GRANT OF SUMMARY JUDGMENT

■ Appellants also challenge the district court's grant of summary judgment as improper because of "numerous and complicated issues" of fact which they argue should have been tried. The alleged issues may be numerous and complicated, but they are not material. Neither in their denial and affidavits below nor in their brief do appellants deny that they were engaged in the unauthorized duplication of appellees' copyrighted compositions in reliance on the compulsory licensing provision. Their denials of other allegations, for example that their sole business is such duplication, or that they had established a "clandestine operation," are beside the point. They admitted the material facts necessary to permit the district court to rule whether, as a matter of law, their activity was protected; no material issue of fact remained in dispute.

Summary judgment was therefore properly granted, and the district court is therefore

Affirmed.

GODBOLD, Circuit Judge (dissenting):

Plaintiffs sued as composition copyright holders. They did not, and could not, sue as manufacturers, because the 1909 Act created no copyright interest in sound recordings of musical compositions, and the protection extended to manufacturers by the 1971 amendments to the Act does not reach the recordings in question.[1] The precise question before us concerns the scope of protection afforded by the 1909 Copyright Act to persons in the position of plaintiffs.

---

1. The 1971 amendments, effective February 15, 1972, were prospective only. No protection is given by any federal legislation to the manufacturer of records which were "fixed" prior to February 15, 1972.

The Congressional purpose in 1909 was twofold, protection of the composer, and at the same time, encouragement of artistic expression by curbing music monopolies.

> Congress feared the creation of a giant music monopoly in which the big publishing houses, which owned most musical copyrights, would negotiate with the great recording companies for exclusive recording contracts. . .
> To avoid a music trust injurious to public and composer alike, and to still protect the composer in his work was the problem Congress faced.

Miller v. Goody, 139 F.Supp. 176, 182 (S.D.N.Y., 1956), rev'd. on other grounds sub nom. Shapiro, Bernstein & Co. v. Goody, 248 F.2d 260 (CA2, 1957).

The composition copyright holder is granted an exclusive performance right by 17 U.S.C. § 1, but its exclusivity is of limited life. Once he records or permits others to record his composition he thereby licenses others to record, and such others must pay him under the "compulsory license" arrangement of subsection (e). These rights were designed to prevent two distinct abuses: (1) mechanical reproduction where the composer does not yet want any permanent recording of his composition, and (2) use of the composition without compensation. H.R.Rep.No.2222, 60th Cong., 2d Sess. (1909), reprinted in S. Rothenberg, Copyright Law, C.1 § 9 at 51–52 (1956).

The interests impinged upon by the first abuse are the artist's privacy and integrity, his right to credit for his own work, and his desire that there not be premature performances of his incomplete or unsatisfactory work. These protected interests have been fully vindicated once the copyright holder records or permits another to record the composition. Recording exemplifies that the piece is ready for public consumption and prevents others from usurping credit for its creation.

The second abuse, use of the composition without compensation, is protected against initially by the composition copyright holder's right to negotiate such terms as he wishes with his authorized licensee. Once the composer's interests of protection against invasion of his privacy and against prematurity have been vindicated the antimonopoly purpose of the Act is then implemented by the compulsory licensing scheme. Copies are made available to the world at large at lower royalty prices than the composer might be willing to offer and lower overall prices than the composer's licensee might offer. In addition compulsory licensees may be the sole means through which the public can obtain ancient, exotic and otherwise unprofitable recordings which other manufacturers and producers withdraw from production and sale.

The underpinning of the majority opinion is the concept that the 1909 Act created in the composition copyright holder a protectible interest in the underlying musical composition, the life of which interest extends beyond the original recording. This judicially-confected interest is the response of judges to copying activities which they find distasteful—i. e., in our free enterprise system one ought to be able to "own" what he composes and be able to "sell" it on terms that he can negotiate, and it looks almost like condemnation of property for private use or taking of property without due process to put the fruits of the composer's labor in the hands of copiers for a small statutory fee. These evisceral reactions are at times not even concealed, and the pejorative terms "pirates" and "parasites" become substitutes for analysis of the scope of the protectible interests accorded by the 1909 Act.

The continuing protectible interest which the majority find was not perceived by Congress when it was considering the Sound Recording Amendments of 1971 (Pub.L. No. 92–140, 85 Stat. 391). In their discussions members of Congress stated that the new legislation was necessary because of a loophole in the 1909 Act allowing pirates to function without

violation of federal law so long as the compulsory licensing provisions are met:

> If the unauthorized producers pay the statutory mechanical royalty required by the Copyright Act for the use of copyrighted music, there is no Federal remedy currently available to combat the unauthorized reproduction of the recording . . .

S.R. 92–72, p. 4; H.R. 92–487, p. 2; U.S. Code Cong. & Admin.News, 1971, p. 1567.

> [Persons who] satisfy the (statutory) clam (sic) of the owner of the music copyright, can and do engage in widespread unauthorized reproduction of phonographic records and tapes without violating Federal copyright law.

H.R. 92–487, p. 2; U.S.Code Cong. & Admin.News, 1971, p. 1567.

Courts upholding the composition copyright owner's claim of infringement by "pirates" have based their analyses on the phrase "similar use" employed in the 1909 Act. These courts have held that "pirate" duplication is an "identical" rather than a "similar" use, and as such is not within the statutory exception. Edward B. Marks Music Corp. v. Colorado Magnetics, Inc., 497 F.2d 285 (CA10) (petition for cert. filed 43 U.S.L.W. 3017 (U.S. July 10, 1974) (No. 73–2006)); Duchess Music Corp. v. Stern, 458 F.2d 1305 (CA9), cert. denied sub nom. Rosner v. Duchess Music Corp., 409 U.S. 847, 93 S.Ct. 52, 34 L.Ed.2d 88 (1972). This exceedingly technical analysis has been subject to criticism by many commentators. See, e.g., J. Nimmer, The Law of Copyright, §§ 108.46–108.4621 at 429–434.1 (1972).

> Suppose a compulsory licensee engages in record piracy. That is, he does not assemble his own performers and technicians to make a new "similar" record based upon the same copyrighted work. Instead he simply duplicates or re-records the previously authorized recording thus saving most of the costs attendant to the manufacture of records. Assuming such a record pirate duly serves a notice of intent to use, and pays the compulsory license royalties, the somewhat astounding result is that as to those sound recordings fixed prior to February 15, 1972, he is not an infringer under the Copyright Act. The only portion of that which he has recorded which is protectible under the Copyright Act, with respect to sound recordings fixed prior to February 15, 1972, is the musical composition itself, and that he is authorized to use for recording purposes upon payment of the statutory royalties. All of the other elements contained in the original record which he has without authority duplicated are not copyrightable, and hence his use of such other elements does not give rise to an action for copyright infringement. (footnotes omitted).

*Id.* at 431–433.

The "identical"–"similar" distinction seems to me only a semantical implementation of the judicial distaste which I have described. It gives to the composer a better statutory monopoly than Congress gave him and erodes the statutory scheme. Additionally, it indirectly confers upon the licensee what amounts to an exclusive right to his mechanical recording, a right which Congress acted to confer in 1971 on the ground it was non-existent.

I agree with Professor Nimmer. I would follow the reasoning used by several courts that have denied or wished to deny relief to composition copyright holders. See Jondora Music Publishing Co. v. Melody Recordings, Inc., 351 F.Supp. 572 (D.N.J., 1972), 362 F.Supp. 488 (D.N.J., 1973), 362 F.Supp. 494 (D.N.J., 1973); International Tape Mfgs. Ass'n. v. Gerstein, 344 F.Supp. 38 (S.D. Fla., 1972), vacated on other grounds, 494 F.2d 25 (CA5, 1974). See also Judge Byrne's dissenting opinion in Duchess Music Corp. v. Stern, 458 F.2d 1305, 1311–1313 (CA9), cert. denied, sub nom., Rosner Duchess Music Corp., 409 U.S. 847, 93 S.Ct. 52, 34 L.Ed.2d 88 (1972), and the dissent of Chief Judge Lewis in Edward B. Marks Music Corp. v. Colorado Magnetics, Inc., 497 F.2d 285, 291–292

2006)). *Jondora* relies on a broad reading of Goldstein v. California, 412 U.S. 546, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973), to support its conclusions. In *Goldstein* the Court upheld a California anti-piracy statute covering recordings made before the 1971 Amendments' effective date. *Jondora* correctly reasoned that the absence of federal preemption could result only if no federal legislation had been enacted to provide a remedy against pirates.

> Thus, under pre-February 15, 1972, law, where the States are free to grant what is the equivalent of state copyright protection, it is clear that Congress has not exercised its copyright powers. . . . [I]f plaintiffs' view—and the view of the *Duchess* Court—were sound, that is, that mechanical recordings enjoyed federal copyright protection before February 15, 1972, not only would there be no need for state action, state action would be barred, since Congress would have indicated its felt view that a national uniform policy was necessary, and not a piecemeal state-by-state approach.

362 F.Supp. at 493.

The ultimate result of my view is that plaintiffs have not established standing to sue, a prerequisite to relief.[2] A plaintiff must allege facts showing that he is adversely affected by defendant's acts. Sierra Club v. Morton, 405 U.S. 727, 738, 92 S.Ct. 1361, 31 L.Ed.2d 636, 645 (1972); Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). So long as defendants tender the statutory compulsory license fee, plaintiffs do not show any judicially cognizable injury. Although the copiers' actions may be offensive to plaintiffs, and plaintiffs might earn higher royalties but for the copying, the plaintiffs are receiving all to which they are entitled. Their complaint is to Congress for not giving them a broader statutory monopoly.

Plaintiffs argue that piracy may harm the public through discouragement of artistic expression and encouragement of monopolies by causing small record companies to collapse as profits are sapped by pirates. Even if these allegations were supported by evidence, plaintiffs' position would not be improved, for they allege no harm to themselves. This is the very flaw which barred consideration of the complaint in *Sierra Club.* A private party cannot seek redress for a public injury absent an allegation of private and individuated harm.

Thus I conclude that plaintiffs have no standing. But if they do have standing, they are not entitled to relief.[3]

---

**2.** I have been unable to find a discussion of standing in any reported opinion of a case such as this. The parties have made no reference to standing, but since it is a jurisdictional prerequisite the court may inquire into it on its own motion. United States v. Storer Broadcasting Co., 351 U.S. 192, 197, 76 S.Ct. 763, 100 L.Ed. 1081, 1088 (1956).

**3.** Since this dissent was prepared the Third Circuit in a two-one decision has reversed Jondora Music Publishing Co. v. Melody Recordings, Inc., 506 F.2d 392, CA3, 1974, No. 74–1241. Judge Gibbons' dissent expresses more ably than I the position which I espouse.