CAPITOL RECORDS, INC., Plaintiff,

v.

NAXOS OF AMERICA, INC., Defendant.

No. 02 Civ. 7890(RWS).

United States District Court, S.D. New York.

May 6, 2003.

Kaplan Gottbetter & Levenson, New York, NY, By: Paul R. Levenson, for Plaintiff, of counsel.

Salans, New York, NY, By: Maxim H. Waldbaum, Lora A. Moffatt, Lori D. Greendorfer, Joseph Petersen, for Defendant, of counsel.

### OPINION

SWEET, District Judge.

Defendant Naxos of America, Inc. ("Naxos") has moved under Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the complaint of plaintiff Capitol Records, Inc. ("Capital") and Capital Records, in turn, has moved for partial summary judgment under Rule 56, Federal Rules of Civil Procedure.

For the reasons set forth below, the Naxos motion to dismiss is converted to a summary judgment motion and granted.

The Capitol motion for partial summary judgment is denied.

### Prior Proceedings

This action was commenced in the Southern District Court of New York on November 22, 2002. The motion was heard and marked fully submitted on February 12, 2003.

### The Parties

Capitol, a manufacturer and distributor of sound recordings in the United States, is a Delaware corporation with its principal place of business located at 150 Fifth Avenue, New York, New York.

Naxos is a foreign corporation with its principal place of business located at 416 Mary Lindsay Polk Drive, Franklin, Tennessee. Naxos is a wholly-owned subsidiary of HNH International Ltd. and the United States distributor of sound recordings under HNH international's "Naxos" label.

### The Complaint

Capitol brings this diversity action for unfair competition, misappropriation of property, unjust enrichment, and common law copyright infringement. (Complaint ¶ 1.) Capitol challenges Naxos' distribution of certain historic performances dating from the 1930's, namely: (i) Yehudi Menuhin's performance of Edward Elgar's "Violin Concerto in B minor, Opus 61," recorded in London, England on July 14 and 5, 1932, and Yehudi Menuhin's performance of Max Bruch's "Violin Concerto No. 1 in G minor, Opus 26,"[1] recorded in London on November 25, 1931 (the "Menuhin Performances"), which Naxos first released on October 1, 1999; (ii) Pablo Casals' performances of the J.S. Bach cello suites recorded in Europe between November 1936 and June 1939 (the "Casals Perfor-

---

1. Although the Menuhin/Bruch recording was not mentioned in Capitol's original complaint,

Capitol properly amended its complaint to include this recording. *See* Section II.

mances"), which Naxos first released on September 5, 2000, and (iii) Edwin Fischer's performance of J.S. Bach's "The Well Tempered Clavier, Book I," recorded between April 1933 and August 1934 in London, England, and Fischer's performance of Bach's "The Well Tempered Clavier, Book II," recorded between February 1935 and June 1936 in London, England (collectively, the "Fischer Performances"), which Naxos first released on October 1, 2000 and January 1, 2001 (the Menuhin Performance, the Casals Performances and the Fischer Performances, collectively, the "subject performances").

Capitol alleges that its corporate affiliate and licensor, EMI Records Limited ("EMI"), formerly known as The Gramophone Company Limited ("Gramophone") owns exclusive rights to the original shellac recordings of these subject performances ("the original recordings"). (Complaint ¶¶ 10–12.) At all relevant times, Capitol claims to be the owner of all rights in the United States to the original recordings. (Complaint ¶ 13.) In or about 1999, without Capitol's permission or authority, Naxos commenced to sell and distribute restorations of the original recordings throughout the United States. (Complaint ¶ 15.) It is alleged that these restorations are sold at substantially discounted prices in direct competition with Capitol's recordings of the subject performances, often in the same retail outlets. (Complaint ¶ 16.) Despite its repeated demands that Naxos cease its distribution of restored recordings, Capital claims that Naxos "continues to exploit the subject recordings in blatant disregard of plaintiff's rights under the laws of New York and the several states." (Complaint ¶¶ 3, 18).

### Conversion to a Summary Judgment Motion

In this case, as there is a well-developed factual record relevant to the disposition of issues raised and as both parties have had "ample opportunity to present relevant material ... and did so," it is appropriate to convert Naxos' motion to dismiss to a summary judgment motion. *See In re G. & A. Books, Inc.*, 770 F.2d 288 (2d Cir. 1985). In upholding such a conversion, the Second Circuit explained:

> The essential inquiry is whether the appellant should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or was taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleadings.... A party cannot complain of lack of a reasonable opportunity to present all material relevant to a motion for summary judgment when both parties have filed exhibits, affidavits, counter-affidavits, depositions, etc. in support of and in opposition to the motion to dismiss.

*Id.* at 295. *See also Cook v. Hirschberg*, 258 F.2d 56, 57–58 (2d Cir.1958); *Condon v. Local 2944, United Steelworkers of America*, 683 F.2d 590, 593–94 (1st Cir. 1982); *Nat'l Family Ins. Co. v. Exchange Nat'l Bank of Chicago*, 474 F.2d 237 (7th Cir.). Here, Naxos provided the Court with a wealth of facts (Heymann Decl.; Ledin Decl; Martson Decl.; Obert–Thorn Decl.), and Capitol has itself moved for summary judgment. Furthermore, in its memorandum of law in support of its motion to dismiss, Naxos states, "To the extent the Court determines that consideration of these declarations is not appropriate in the context of a Rule 12(b)(6) motion to dismiss, it may convert the motion to one for summary judgment." (Naxos Mem. at 3 n. 1.). Both parties should thus "reasonably have recognized the possibility" of conversion. *In re G. & A. Books, Inc.*, 770 F.2d at 295.

*Facts*

The facts are set forth based upon the Local Rule 56.1 statements of Capitol, the response by Naxos, and the parties' pleadings and affidavits.

In the 1930's, Gramophone (subsequently EMI), Capitol's affiliate and licensor, obtained copyrights in the subject performances. Each of the musicians signed an agreement granting Gramophone "sole exclusive worldwide rights" to their performances. (Lyttelton Decl. ¶¶ 3–5.) All of these agreements are to "be construed according to the Laws of England." and none of these agreements specifies the intent of the parties concerning the duration or scope of transferred rights. (Lyttelton Decl., Ex. 2–4.) According to English law, the copyrights in the agreements expired, at the latest, in 1986, and the recordings have entered the public domain internationally.

Gramophone paid all costs associated with recording the subject performances, including compensation for the musicians.

There is some dispute as to the payment of royalties. Capitol alleges that Gramophone and EMI paid royalties to the musicians in connection with the subject performances, and EMI continues to pay royalties on all United States' sales of the subject works. However, it is unclear from the documentation of royalty payments, the length of time in which royalties were paid, or if they were consistently paid. According to the Menuhin and Fischer agreements, royalties were only to be paid during the life of the performer.

There is also some contention as to the chain of title leading to Capitol. Capitol claims that its interests in the recordings were transmitted in a Matrix Exchange Agreement from EMI Music International Services Ltd. ("EMIMIS"), who received them from EMI. First, it is unclear when and how rights were transferred from EMI to EMIMIS. Second, the Matrix Exchange Agreement was executed in 1996, years after any copyright in the sound recordings at issue expired in England.

Naxos used the original recordings, the so-called shellacs, to restore the subject performances. The restorations involved artistic choices and the use of the latest digital software. Since in or about October 1999, Naxos has distributed and sold these restorations at discount prices throughout the United States. The Naxos restorations have been widely praised by classical music critics.

Naxos distributed its restorations without Capitol's authorization. In a December 21, 1999 letter to Naxos, Capitol objected to Naxos' distribution of the restored recordings and requested that Naxos cease and desist. Naxos refused, continuing to sell the restorations throughout the United States.

Naxos alleges that EMI expressly disclaimed any exclusive commercial interest in the original recordings more than fifty years ago. EMI informed Mr. Richard Warren, the Curator of Yale University's Historical Sound Recordings Collection, that it had no intellectual property rights to historical recordings that were out of copyright in the United Kingdom.

EMI's own restorations of the original recordings, distributed in the United States, claim copyright solely in the restored versions of the performances and not in the underlying sound recordings. The "reservation of rights" language relied upon by Capitol to dispute this claim refers only to EMI's restorations of the original recordings and not to the underlying recordings.

Capitol has, furthermore, failed to pursue others engaging in restorations of the original recordings.

## I. SUMMARY JUDGMENT

### A. The Summary Judgment Standard

Summary judgment is granted only if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); see generally 6 James Wm. Moore, et al., Moore's Federal Practice ¶ 56.15 (2d ed.1983). The court will not try issues of fact on a motion for summary judgment, but, rather, will determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party has the burden of showing that there are no material facts in dispute, and the court must resolve all ambiguities and draw all reasonable inferences in favor of the party opposing the motion—in this instance, the defendants. *Bickhardt v. Ratner*, 871 F.Supp. 613 (S.D.N.Y.1994) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Thus, "[s]ummary judgment may be granted if, upon reviewing the evidence in the light most favorable to the non-movant, the court determines that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Richardson v. Selsky*, 5 F.3d 616, 621 (2d Cir. 1993).

A material fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 57 (2d Cir.1997).

The burden on the moving party is especially stringent in cases where no there has been no discovery. "[O]nly in the rarest of cases may summary judgment be granted against a [party] who has not been afforded the opportunity to conduct discovery." *Orminski*, 105 F.Supp.2d at 7.

### B. Issues

#### 1. Applicable Law

■ Both parties agree that as sound recordings "fixed before February 15, 1972," the original recordings are not protected by federal copyright law. 17 U.S.C. § 104A(h)(6)(C)(ii). Capitol thus maintains that it "asserts no federal copyright claim in this action." (Def's Opp. Mem. at 8 n. 7.)

However, as pre–1972 recordings, the original recordings are covered by state common law protections until February 15, 2067. As 17 U.S.C. § 301(c) provides: "With respect to sound recordings fixed before February 15, 1972, any rights or remedies under the common law or statutes of any State shall not be annulled or limited by this title until February 15, 2067."

■ As Capitol concedes, the "hot news" doctrine is not a common law protection applicable to this case. (Pl.'s Mem. at 17.) This doctrine creates a narrow quasi property right in news, which as facts "may not be copyrighted," *Fin. Info., Inc. v. Moody's Investors Serv. Inc.*, 808 F.2d 204, 207 (2d Cir.1986), only as against business competitors and only until its commercial value as "hot news" has passed. *Int'l News Serv. v. Associated Press*, 248 U.S. 215, 236, 39 S.Ct. 68, 63 L.Ed. 211 (1918). In upholding its ruling, the Supreme Court emphasized "[t]he peculiar value of new is in the spreading of it while it is fresh." *Id.* at 235, 39 S.Ct. 68. This is definitely not the case with music or other artistic works, which continue to be salable when old, as this case demon-

strates. The "hot news" doctrine thus creates a special protection for certain information, normally outside the realm of copyright coverage, and it does not affect or limit protection of artistic works. It is "concerned with the copying and publication of information gathered by another before he has been able to utilize his competitive edge." *Fin. Info., Inc.*, 808 F.2d 204, 209 (applying the "hot news" doctrine to information about bond calls). *See also Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 845 (2d Cir.1997) (applying the "hot news" doctrine to the transmission of "real-time" NBA game scores and statistics).

Capitol must, therefore, rely exclusively on New York common law—a hybrid copyright, unfair competition cause of action—in supporting its claims. *See Apple Corps Ltd. v. Adirondack Group*, 124 Misc.2d 351, 476 N.Y.S.2d 716 (1983) (upholding common law unfair competition claims for the unauthorized manufacture and sale of 14 to 20 year old Beatles' recordings); *Firma Melodiya v. ZYX Music GmbH*, 882 F.Supp. 1306, 1316 n. 14 (S.D.N.Y. 1995) ("Melodiya's common law copyright and unfair competition claims are not preempted by the Federal Copyright Act since the master recordings were made prior to February 15, 1972, the date when Congress first extended federal copyright protection to sound recordings."); *Arista Records, Inc. v. MP3Board*, No. 00 Civ.

4660, 2002 WL 1997918, at *12 (S.D.N.Y. Aug.29, 2002) (recognizing an unfair competition claim pursuant to New York common law with respect to the electronic file sharing of record companies' pre–1972 recordings).

■ Capitol is correct to claim that the original recordings need not be from "commercially available sources" in order to receive this protection. In *Apple Corps*, defendants sold unauthorized copies of recordings of Christmas messages to members of the Beatles' Fan Clubs that were never commercially distributed. 476 N.Y.S.2d at 719. In *Metropolitan Opera Ass'n v. Wagner–Nichols Recorder Corp.*, defendant's recordings were made directly from public radio broadcasts, not from records. 199 Misc. 786, 101 N.Y.S.2d 483, 487 (1950). Similarly, in *Arista*, defendant's website permitted internet file sharing and copying of computer-stored version of plaintiff's recordings, and not copying from any commercially available source2002 WL 1997918, at *1.

### 2. *Capitol Has No Rights in the Original Recordings* [2]

■ As an initial matter, it is irrelevant whether Capital made restorations of the original recordings of the subject performances available "intermittently" (Def.'s Mem. at 2) or "continuously" (Pl.'s Mem. at 4). Capital either has a protected

---

**2.** In the parties' papers, there is some fuzziness as to whether it is Capitol's interests in the original recordings or in the subject performances that is at stake. The agreements with the musicians are for "rights to musical performances." (Lyttelton Decl. ¶¶ 2–4.) However, these performances have already taken place, and Naxos does not seek the right to profit from an alternative broadcasting of these performances. *Compare with* cases discussed in *Metropolitan Opera*, 101 N.Y.S.2d at 495–96. *E.g., Rudolph Mayer Pictures Inc. v. Pathe News Inc.*, 235 A.D. 774, 255 N.Y.S. 1016 (1st Dep't 1936) (protecting plaintiff's exclusive right to take and sell pictures of the Sharkey–Walker boxing match and enjoining defendants from distributing pictures they had taken of the boxing match); *Pittsburgh Athletic Co. v. KQV Broadcasting Co.*, 24 F.Supp. 490 (W.D.Penn.1938) (sustaining plaintiff's exclusive right to control the broadcasting of descriptions of baseball games and enjoining defendants from broadcasting play-by-play descriptions of the games). Thus, this case only deals with any rights transferred from the performances to the original recordings.

interest in the original shellac recordings, or it does not. It does not lose its interest by failing to make use of it. Unlike the "use-it-or-lose-it" principle in trademark law, copyright owners also have the right not to distribute a work. *Seshadri v. Kasraian,* 130 F.3d 798, 805 (7th Cir.1997) ("Implicit in the copyright holder's exclusive right to distribute copies of his work to the public . . . is the right not to publish the work.").

However, the facts are inadequate to support Capitol's claim of intellectual property rights in the original recordings. The English copyrights in the agreements have long since expired, there is ambiguity concerning Capitol's chain of title and the agreement with Casals, and Capitol appears to have waived or abandoned any interests it had in the original recordings.

In the agreement with Casals, there is no identified (UK) copyright holder because there is no specific mention of the ownership of the plate. Under applicable English copyright law, the owner of any copyright interest in a sound recording depends upon ownership of the plate. Copyright Act, 1911, § 19 ("[T]he person who was the owner of such original plate at the time when such plate was made shall be deemed to be the author of the work.").

■ Additionally, Capitol waived and abandoned any rights in the original recordings. EMI expressly disclaimed any intellectual property rights in sound recordings made prior to 1957 and which are more than fifty years old. EMI informed Mr. Richard Warren, the Curator of Yale University's Historical Sound Recordings Collection, in response to his inquiry as to "what procedure, if any, Yale was required to undertake with respect to third party requests to make . . . copies of historical recordings made by EMI prior to 1972," that it had no intellectual property rights to historical recordings that were out of

copyright in the United Kingdom. (Warren Decl. ¶¶ 4–10.) According to Mr. Warren, EMI has never changed its policy that such works are in the "public domain." (Warren Decl. ¶¶ 9, 10.) Yale currently charges publishers a fee in exchange for access to historic recordings where such access is for the purpose of restoration and commercial re-issue. Thus, as EMI is aware, Yale's collection serves as a revenue-generating side enterprise. (Heymann Decl. II ¶ 8.)

■ A claim of waiver requires proof of an "intentional relinquishment of a known right with both knowledge of its existence and an intention to relinquish it." *Airco Alloys Div. v. Niagara Mohawk Power Corp.,* 76 A.D.2d 68, 81, 430 N.Y.S.2d 179, 187 (4th Dep't 1980) (*quoting Werking v. Amity Estates,* 2 N.Y.2d 43, 52, 155 N.Y.S.2d 633, 642, 137 N.E.2d 321 (1956)); *see also Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.,* No. 96 Civ. 4126, 2000 WL 1028634, at *20 (S.D.N.Y. July 25, 2000) (same). A waiver "may arise 'by express agreement or by such conduct or failure to act as to evince an intent not to claim the purported advantage.'" *Gresser v. Princi,* 128 A.D.2d 752, 753, 513 N.Y.S.2d 462, 464 (2d Dep't 1987) (*quoting Hadden v. Consol. Edison Co.,* 45 N.Y.2d 466, 469, 410 N.Y.S.2d 274, 382 N.E.2d 1136 (1978)). EMI's conduct with regards to the Yale University recordings qualifies as a waiver. Moreover, "[a] waiver to the extent that it has been executed, cannot be expunged or recalled." *Nassau Trust Co. v. Montrose Concrete Prods. Corp.,* 56 N.Y.2d 175, 184, 451 N.Y.S.2d 663, 668, 436 N.E.2d 1265 (1982).

■ To establish abandonment, the defendant must demonstrate: "(1) an intent by the copyright holder to surrender rights in the work; and (2) an overt act evidencing that intent." *Paramount Pic-*

*tures Corp. v. Carol Publ'g Group,* 11 F.Supp.2d 329, 337 (S.D.N.Y.1998); *see also Penguin Books,* 2000 WL 1028634, at \*20 (same). In *Stuff v. E.C. Publ'ns, Inc.,* 342 F.2d 143, 144–45 (2d Cir.1965), the court found abandonment where the copyrighted work "had appeared over a long period of time and ... plaintiff's husband had been most derelict in preventing others from infringing his copyright. The findings ... support the inference ... that the copyright owner authorized or acquiesced in the wide circulation of the copies without notice." Similarly, in *Fashion Originators Guild of Am., Inc. v. FTC,* 114 F.2d 80, 84 (2d Cir.1940), *aff'd,* 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941), the court explained that offering clothing containing a design for general sale placed the design in the public domain to be freely copied by third parties.

Likewise, in *Bell v. Combined Registry Co.,* 397 F.Supp. 1241, 1247 (N.D.Ill.1975), *aff'd,* 536 F.2d 164 (7th Cir.1976), plaintiff was found to have abandoned his copyright interest in his poem by not objecting to a psychiatrist's dissemination of thousands of copies of the poem to his patients, and by affirmatively stating that he would not object. The court held that a "limited distribution, even if not widespread enough to effect a forfeiture, can, coupled with the requisite intent, cause an abandonment." *Id.* at 1249. The court found that the plaintiff's authorization of the poem's distribution constituted "strong evidence that the author did not endeavor to protect a commercial property." *Id.*

In line with Capitol's waiver/abandonment of rights, EMI's own restorations of the original recordings distributed in the United States claim copyright solely in the restored versions of the performances and not in the underlying sound recordings. (Heymann Decl. ¶ 11.) The "reservation of rights" language relied upon by Capitol to dispute this claim refers only to EMI's restorations of the original recordings and

not to the underlying recordings. (McMullan Decl. ¶ 15.)

■ Furthermore, Capitol has failed to pursue the many other companies presently selling restorations of the original recordings without any authority from Capitol. (Heymann Decl. I ¶ 14, Ex. D.) Capitol does not deny the existence of this third party conduct and responds that it is now investigating it. (Pl.'s Mem. at 15.) Capitol's lax practices are consistent with EMI's disclaimer of any intellectual property rights in any sound recordings made prior to 1957 and which are more than fifty years old. (Warren Decl. ¶¶ 4–10.) The Second Circuit has further held that a defendant's innocence and justifiable reliance on a plaintiff's failure to prevent previous copyright infringement can lead to latches, barring the assertion of copyright claims. *Saratoga Vichy Spring Co., Inc. v. Lehman,* 625 F.2d 1037, 1041–42 (2d Cir.1980).

The cases cited by Capitol are inapposite here. *New York World's Fair 1964–1965 Corp. v. Colourpicture Publishers, Inc.,* 1964 WL 8151 (N.Y.Sup.Ct. June 10, 1964), *aff'd,* 21 A.D.2d 896, 251 N.Y.S.2d 885 (2d Dep't 1964), involved ongoing and "enormous expenditures of time, effort, money and skill" in a time-sensitive situation, and there was no claim, as here, that plaintiff failed to police rampant third party infringement. *Id.* at 942, 251 N.Y.S.2d 885. *Sweetheart Plastics, Inc. v. Detroit Forming, Inc.,* 743 F.2d 1039 (4th Cir.1984) involved the Lanham Act and concerned estoppel by acquiescence, as opposed to abandonment. *Id.* at 1046. *Hoover Co. v. Western Vacuum Bag Mfg., Inc.,* No. 63 Civ. 3566, 1964 WL 8146 (S.D.N.Y. May 11, 1964) is also irrelevant because it is a trademark case where defendant sought justification for its "unfair emphasis" on the "Hoover mark." Here, in contrast, the third parties in question operate under the

good faith belief, like Naxos, that the works at issue are in the public domain.

Capitol's cases that are more on point support a finding of waiver and abandonment. Unlike in the *Penguin Books* case, here there is an "overt act by Plaintiff evidencing an intent to surrender the copyright" both with regards to the Yale policy and EMI's own reservation of rights. *Penguin Books,* 2000 WL 1028634, at *20. Furthermore, this is not a case where "an occasional infringement slips through a copyright holder's surveillance" and the plaintiff "has expended substantial resources in enforcing its copyrights." *Paramount Pictures,* 11 F.Supp.2d at 337.

Finally, it is unclear from the documentation of royalty payments, the length of time in which royalties were paid, or if they were consistently paid. Naxos claims that it is ambiguous as to whether the Menuhin and Fischer agreements remain in force since royalties were only to be paid during the life of the performer.

### 3. *Naxos Has Not Competed Unfairly*

■ Since Capitol has no rights in the original recordings, it cannot charge Naxos with unfair competition. As both parties agree, unauthorized copying without more is not actionable. (Def.'s Mem. at 16; Pl.'s Opp. Mem. at 18.) *See Leonard Storch Enters., Inc. v. Mergenthaler,* No. 78–C–238, 1980 WL 1175, at *30 (E.D.N.Y. Aug.8, 1980) ("[N]o New York case has ever recognized a right of unfair competition based solely on the copying or photocopying of a tangible product."), *aff'd,* 659 F.2d 1060 (2d Cir.1981).

■ A plaintiff only has a viable claim where it also has exclusive, cognizable rights to the property it seeks to prevent from copying. *E.g., Hebrew Publ'g Co. v. Scharfstein,* 288 N.Y. 374, 376–77, 43 N.E.2d 449 (1942) (holding that "without more," for defendant to copy books published by plaintiff, which were not covered by copyright, and then sell these copies does not state a claim for unfair competition); *G. Ricordi & Co. v. Haendler,* 194 F.2d 914, 915–16 (2d Cir.1952) (holding that defendant is not entitled to a preliminary injunction where defendant photocopied and then sold plaintiff's book after its copyright expired); *Mastro Plastics Corp. v. Emenee Indus., Inc.,* 16 A.D.2d 420, 228 N.Y.S.2d 514 (1st Dep't 1962) (finding no action for unfair competition where plaintiff held no patent in the design of drums it had manufactured, and defendant resold the drums with plaintiff's trademark replaced by its own). Without a copyright or legal recognition, "a man's property is limited to the chattels which embody his invention," and "[o]thers may imitate these at their pleasure" and even resell them as their own. *Id.* at 516. Thus, it is not enough for Capitol to allege that Naxos copied and restored the original recordings without authorization, but Capitol must first show that it has a legally protected interest in these recordings.

Furthermore, the cases cited by Capitol, where a state common law violation was found, are distinguishable from the present case. In its holding in *Fonotipia,* the court explained, "where a product is placed upon the market, under advertisement and statement that the substitute or imitating product is a duplicate of the original, and where the commercial value of the imitation lies in the fact that it takes advantage of and appropriates to itself the commercial qualities, reputation, and salable properties of the original, equity should grant relief." 171 F. 951, 964 (C.C.E.D.N.Y. 1909).

This is different from what Naxos did here. Naxos never falsely advertised its restored product as a "duplicate" of the original, and it did not take advantage of the "commercial qualities" and "salable properties" of the original. Rather, as

Naxos points out, the original recordings are not even salable because time-worn shellacs are marred by numerous sound imperfections, and the types of machines which can extract sound from sound shellacs became obsolete many years ago and are unavailable to the majority of consumers. Thus, Naxos needed to employ significant effort to create an entirely new and commercially viable product. (Obert–Thorn Decl. ¶ 19 ("What the transfer engineer does is a value-added process which takes the raw material or the original recording and uses skill, technology and taste in order to make it into a new and unique product.").)

Likewise, in *Apple Corps* and *Metropolitan Opera*, the court was primarily concerned with a defendant "endeavoring to reap where it has not sown." *Metropolitan Opera*, 101 N.Y.S.2d at 490. *Apple Corps* recognized record piracy, a form of unfair competition, "[w]here the apparent purpose is to reap where one has not sown, or to gather where one has not planted, or to build upon, or profit from, the name, reputation, good will or work of another." 476 N.Y.S.2d at 719. Again, this is not the case here. As Naxos' raw materials, the shellacs, were commercially unsalable, its actions cannot be characterized as "unauthorized interference . . . at precisely the point where the profit is to be reaped." *Metropolitan Opera*, 101 N.Y.S.2d at 490. Furthermore, Naxos did not "profit from the labor, skill, expenditures, name and reputation of others," but rather created and marketed a new product relying on its own labor, skill, and reputation. *Id.* at 492.

Unlike in the instant case, the recordings in *Capitol Records, Arista,* and *Firma Melodiya* all purported to be identical reproductions of the original. In *Capitol Records*, defendants sold a record, containing (or at least attempting to) "identical reproductions of certain phonograph records being sold by plaintiff," and they "pressed the records just as if it was the bona fide product of the plaintiff." *Capitol Records, Inc. v. Greatest Records, Inc.,* 43 Misc.2d 878, 252 N.Y.S.2d 553, 554, 555 (1964). There is thus an element of fraud and deception present, which is significantly absent with Naxos' restorations. In *Arista*, at issue was Internet cite providing users with links to pirated copies of the record companies' copyrighted musical recordings. This site neither offered nor claimed to offer improvements on the original recordings. In *Firma Melodiya*, defendants did "not deny they are distributing copies of Melodiya's master recordings," but rather claimed a right to do this on the basis of a forged addendum. 882 F.Supp. at 1316. In this way, the defendants did not even argue they were producing and selling a new product, but rather claimed a right to plaintiff's product on the basis of an unlawful forgery.

The *Fame Publ'g Case*, which discusses the elements of tape piracy for recordings protected by the federal Copyright Act, stresses the identical nature of the recording and the lack of effort expended by the copier. No value is added by the copier, and "[t]he end product . . . is not only 'similar' but virtually indistinguishable." *Fame Publ'g Co. v. Alabama Custom Tape, Inc.,* 507 F.2d 667, 669–70 (5th Cir. 1975). Furthermore, "[w]hile most record producers face substantial risks and expenses, never knowing whether their efforts will succeed, [tape pirates] encounter no such problems; they buy their hits for a song." *Id.* at 668. Here, Naxos was not simply "duplicating a sound recording of a performance," and it did not purchase its "hits for a song." *Id.* at 669, 668. Rather, Naxos invested time, energy, money, and creativity in obtaining the original shellacs and making the restorations. (Obert–Thorn Decl. ¶¶ 8–10; Ledin Decl. ¶¶ 1–21; Marston Decl. ¶¶ 6–9.)

The quality and nature of the restorations stand as evidence to the fact that Naxos did not aim to simply duplicate the original recordings and capitalize on Capitol's efforts. Instead, Naxos worked to create a new product with superior sound. (Heymann Decl. ¶¶ 12–13; Obert–Thorn Decl. ¶¶ 21–22; Ledin Decl. ¶¶ 23; Marston Decl. ¶¶ 10 (testifying to the superiority of the restorations that have been extraordinarily well-received by classical music critics).) This is very different from the inferior copies at issue in the cases Capitol cites. *E.g., Metropolitan Opera,* 101 N.Y.S.2d at 487 ("The quality of [the defendants'] recordings is inferior to that of Columbia Records and is so low that Metropolitan Opera would not have approved the sale and release of such records to the general public."); *Capitol Records,* 252 N.Y.S.2d at 555 (describing a loss of "public good will" "because of the fact that the product turned out by defendants is inferior to that produced by [plaintiff]."); *Apple Corps.,* 476 N.Y.S.2d at 719 (referring to the Beatles' "right to prevent recordings of inferior quality ... from being commercially distributed").

The tape piracy decisions further are grounded in public policy considerations inapplicable here. In the *Metropolitan Opera* case, for instance, the Court was motivated by concern with the "fostering and encouragement of fine performances of grand opera, and their preservation and dissemination to wide audiences," 101 N.Y.S.2d at 497, and with protecting against the "invasion of the moral standards of the market place." *Id.* at 500. In contrast with the duplicates in *Metropolitan Opera,* the Naxos restorations would not discourage, but rather encourage "the preservation and dissemination" of "fine performances." As the musicians in the subject performances, the public's interest in ensuring that artists have ample incentive for performance is not implicated. Naxos did not produce a cheap knock-off of Capitol's recordings that would undercut and discourage Capitol's investment. Rather, Capitol is free to work on its own restorations and place them on the market in competition with those of Naxos. In fact, it is even possible that Naxos' restorations have revived the relevant market in historic classical performances to Capitol's benefit. (Def.'s Opp. Mem. at 24.) Thus, the Naxos restorations help ensure that quality historic performances are commercially available for the present generation and well-preserved for the next. A February 3, 2002 article in The Chicago Tribune went so far as to conclude, "The great salvation for classical recording continues to lie with the smaller independent labels. .[e]nterprising indies such as ... Naxos ... continue to put out records that justify themselves artistically." (Def's Mem. at 11.)

Moreover, Naxos lacks the bad faith necessary in a common law unfair competition claim. As explained in *Saratoga Vichy Spring Co., Inc. v. Lehman,* "[c]entral [to an unfair competition claim] is some element of bad faith." 625 F.2d 1037, 1044 (2d Cir.1980). In this case, the court denied plaintiff's unfair competition claim since it could not show that defendant was "attempting to capitalize on [its] efforts" and defendant's misappropriation of its "labors and expenditures." *Id. See also Eagle Comtronics, Inc. v. Pico Products, Inc.,* 256 A.D.2d 1202, 682 N.Y.S.2d 505, 506 (4th Dep't 1998) ("Under Federal or State law, the gravamen of a claim of unfair competition is the bad faith misappropriation of a commercial advantage belonging to another by infringement or dilution of a trademark or trade name or by

exploitation of proprietary information or trade secrets."); *Computer Assocs.Int'l, Inc. v. Computer Automation, Inc.*, 678 F.Supp. 424, 429 (S.D.N.Y.1987) ("The essence of [an unfair competition claim] is the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of goods."). Even with the extension of the doctrine of unfair competition to apply to misrepresentation, or "the selling of another's goods as one's own, as well as misappropriation, or "the palming off of one's goods as those of a rival trader," Naxos lacks the requisite bad faith. It neither attempted to sell its records as Capitol's, nor sell Capitol's records as its own. It did not misappropriate Capitol's labor and expenditures, but rather sought to profit from its own efforts and ingenuity.

## II. *THE MENUHIN/BRUCH CLAIMS ARE NOT TIME–BARRED*

 The Menuhin/ Bruch claims are not barred by the three-year statute of limitations for a claim of unfair competition based on misappropriation. *E.g., Sporn v. MCA Records, Inc.*, 88 A.D.2d 857, 451 N.Y.S.2d 750 (1st Dep't 1982). It is true that Naxos commenced the distribution of the Menuhin Performances on October 1, 1999, and Capitol amended its complaint to include the Menuhin/Bruch performance on October 1, 1999. However, the Menuhin/Bruch claims relate back to the commencement of this action pursuant to Federal Rule of Civil Procedure 15(c). Under this rule, "[a]n amendment of a pleading relates back to the date of the original pleading when ... the claim ... asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Fed.R.Civ.P. 15(c).

Relation back is liberally allowed, and the test is whether the facts alleged in the original complaint give sufficient notice of the conduct and transactions underlying the amendment to avoid unfair and prejudicial surprise to the defendant. *O'Hara v. Weeks Marine, Inc.*, 294 F.3d 55, 68–70 (2d Cir.2002); *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 86–87 (2d Cir. 1999).

This test is met here. The Menuhin/Bruch claims arise out of the same transactions and occurrences that underlie Capitol's original Complaint. Naxos sold the Menuhin/Bruch recording on the same compact disc as the Menuhin/Elgar recording, and the original complaint put Naxos on notice as to Capitol's claims with regards to Menuhin recordings from this period. The amendment thus resulted in no unfair surprise to Naxos.

## *CONCLUSION*

Summary judgment is granted in Naxos' favor, and Capitol is granted leave to submit any additional factual material within twenty (20) days or within such time as counsel may agree or the Court determine upon application.

In default of any additional submissions, submit judgment on notice.

It is so ordered.