**CAPITOL RECORDS, INC., Plaintiff,**

v.

**NAXOS OF AMERICA, INC., Defendant.**

**No. 02 Civ. 7890(RWS).**

United States District Court, S.D. New York.

July 30, 2003.

Kaplan Gottbetter & Levenson, New York, NY (Paul R. Levenson, of counsel,) for Plaintiff.

Salans, New York, NY (Maxim H. Waldbaum, Lora A. Moffatt, Lori D. Greendorfer, Joseph Petersen, of counsel), for Defendant.

### OPINION

SWEET, District Judge.

On June 16, 2003, plaintiff Capitol Records, Inc. ("Capitol") provided supplemental evidentiary submissions in opposition to the converted motion of defendant Naxos of America, Inc. ("Naxos") for summary judgment, as authorized by the Court's May 6, 2003 opinion (the "May 6 Opinion"). *Capitol Records, Inc. v. Naxos of America, Inc.*, 262 F.Supp.2d 204 (S.D.N.Y.2003). Capitol further moved, pursuant to Rule 56(f) of the Federal Rules of Civil Procedure, for additional discovery. Familiarity with the May 6 Opinion is assumed. This motion was marked fully submitted on June 19, 2003.

For the reasons set forth below Capitol's motion is denied.

### The Parties

Capitol, a manufacturer and distributor of sound recordings in the United States, is a Delaware corporation with its principal place of business located at 150 Fifth Avenue, New York, New York.

Naxos is a foreign corporation with its principal place of business located at 416 Mary Lindsay Polk Drive, Franklin, Tennessee. Naxos is a wholly owned subsidiary of HNH International Ltd. and the United States distributor of sound recordings under HNH international's "Naxos" label.

### Review of the Additional Facts

#### 1. English Copyright

In support of its motion, Capitol submitted a Declaration by David Helfer ("Helfer"), one of Capitol's associate attorneys. Helfer attested that Capitol continuously has been the licensed distributor of EMI Records Ltd.'s ("EMI") recordings in the United States since 1956, before any of the recordings at issue in this action entered the public domain in Britain. (Helfer Decl. ¶ 2.) This may be true, but the fact remains that these recordings are currently in the public domain.

Capitol further argues that the duration and scope of transferred rights from the performers were complete, perpetual, and worldwide and thus not limited by British copyright law. The Casals agreement grants The Gramophone Company Ltd. ("Gramophone") "the sole right of production, reproduction, sale, use and performance (including broadcasting) throughout the world by any and every means whatso-

ever of the records of the works performed by the Artiste under this Agreement." (Casals Agreement ¶ 8.) The Menuhin and Fisher agreements state: "The Company shall also be the absolute owner of all rights in the Artiste's personal performance and all rights of any nature whatsoever in respect of the records made by the Artiste for the Company that the Artiste shall at any time possess in any country of the world where the Copyright Act 1911 is not in force." (Menuhin, Fisher Agreements ¶ 8.) However, the Copyright Act of 1911 is the applicable copyright statute protecting the agreement, as conceded by Capitol. (Gare Briefing Paper ¶ 15.)

### 2. *Ambiguity Concerning Chain of Title*

#### a. *Matrix Exchange Agreement*

There remains ambiguity in Capitol's chain of title. The Matrix Exchange Agreement was executed in 1996, years after any copyright in the sound recordings at issue expired in England. Furthermore, Exhibit 20 in support of Capitol's motion, a copy of the first of Capitol's licenses to distribute EMI's recordings in the United States, contains no reference to the transfer of rights from EMI to EMI Music International Services Ltd. ("EMIMIS"), Capitol's alleged licensor.

#### b. *Casals Recordings*

There is further ambiguity with regards to the Casals agreement. Under English copyright law, the owner of the copyright interest in a sound recording depends on the ownership of the plate, and there is no specific mention of plate ownership in the Casals agreement. Copyright Act, 1911, § 19. Capitol concedes this to be the case, but submits a "Briefing Paper" by Stephen Gare ("Gare"), a Partner in the law firm Mayer, Brown, Rowe & Maw LLP,[1] arguing that:

> It appears from the wording of the Casals Agreement that The Gramophone Company Limited would have owned the original plates (and thus the sound recording copyrights). This is wholly consistent with industry practice at the time and, in my view, it is inconceivable that anyone but The Gramophone Company Limited would have owned the plates in question.

> If Casals was himself somehow the owner of the original plates (and thus the first owner of the sound recording copyrights), Clause 8 of the Casals Agreement would have operated as an assignment of those rights to The Gramophone Company Limited (immediately transferring legal title in respect to those recordings made prior to the Casals Agreement's execution and enforceable as an agreement to assign legal title in respect of those recordings made afterwards). The transfer of the original plates themselves is immaterial to this analysis as their ownership is only relevant to determining the first owner.

(Gare Briefing Paper ¶¶ 26, 27.)

Gare points to certain provisions in the Casals agreement "consistent with recording company having control over the production and exploitation of the sound recordings made" and suggesting "that The Gramophone Company Limited was the owner of the plates in question." (Gare Briefing Paper ¶ 17.) Gare points out that the agreement requires Casals to be in attendance "at such places and times ... as the Company shall require," perform "such titles ... as the Company shall se-

---

**1.** Notably, Mr. Gare's statements are contained in a briefing paper and not sworn in a declaration or affidavit.

lect for reproduction," and repeat performances at the Company's request in order to produce "a perfect master matrix." *Id.* Gare further notes that the agreement prohibits Casals from performing musical works for third parties "for the purpose of such performance being reproduced or rendered audible by means of electrical or mechanical contrivances, devices or appliances," but does not refer to Casals himself making a plate. *Id.*

Citing industry practice at the time, Gare explains, "The sound recording 'plate' at the heart of that process was invariably owned by the record company, and not by the artist or any third party." (Gare Briefing Paper ¶ 14.)

Perhaps Gare's surmises are correct, but they remain conjectures based on "suggest[ions]." (Gare Briefing Paper ¶ 17.) Clause 8 of the Casals Agreement states: "THE Company shall be entitled to the sole right of production, reproduction, sale, use and performance (including broadcasting) throughout the world by any and every means whatsoever of the records of the works performed by the Artiste under this Agreement." This clause further strengthens Gare's conclusion, giving rise to a factual question that cannot be resolved on a summary judgment motion. However, this issue is not dispositive at this time.

### 3. *Waiver/Abandonment of Claims*

As previously held, EMI expressly disclaimed any exclusive commercial interest in original recordings made more than fifty years ago. EMI informed Mr. Richard Warren ("Warren"), the Curator of Yale University's Historical Sound Recordings Collection, that it has no intellectual property rights to historical recordings that were out of copyright in the United Kingdom. On December 21, 1978, Mr. A.W. Dewdney ("Dewdney"), the manager of EMI's Copyright Department in England, wrote:

> I am not unfortunately conversant with American copyright law but I cannot believe that all recordings, as opposed to the musical works on the records, are protected for perpetuity. It is very rare for any country to give protection to another country's rights if they have ceased to exist in the country of origin. In the U.K. for example a right subsists in recordings for 50 years from the end of the year in which that recording was made.... I can confirm that if the musical content is public domain and the recording made before 1927, no permission is needed [to make copies for personal use, broadcast, or reissue].

In 1986, Mr. A.R. Locantro ("Locantro"), an EMI manager in the Licensing Department of EMI, whose "function is to control the exploitation and licensing of the catalogue of classical recordings belonging to the International Classical Division of EMI Music," also wrote Warren a letter regarding the copyright situation of old sound recordings.[2] He first confirmed that a third party "was wrong in believing" he needed a letter of authorization from EMI before he could copy a recording "when the recording in question is public domain."[3] He then went on to explain:

> As far as the general principles of the situation are concerned, I fully agree with the exchange of correspondence which you had with Mr. Dewdney in that it correctly sets out the legal situation

---

**2.** Locantro characterized Dewdney as having "wide responsibility relating to international copyright matters."

**3.** Locantro pointed out in his declaration that the third party's company, Caedmon, was EMI's exclusive licensee with respect to a number of recordings. (Locantro Decl. ¶ 8.)

pertaining to public domain recordings and I confirm that these principles should continue to apply to all EMI recordings with the cut-off date for expiration of UK copyright being 31st December at the end of a full 50 years from the recording date of recordings made before June 1957 and from the date of first publication for recordings made after that date.[4]

These letters set out the policies Yale's music library, "one of the largest collections of classical music scores, sound recordings, and music research materials in the United States," is supposed to take with regards to patrons who wish to copy recordings for both personal and commercial uses. (Warren Decl. ¶¶ 2, 4.) These transactions would be taking place in the United States, and patrons could be of any nationality.

### a. *Third Party Infringers*

Capitol's lax practices with regards to third party infringers are consistent with EMI's disclaimer of intellectual property rights in any sound recordings made prior to 1957 and which are more than fifty years old. In its previous submissions, Capitol did not deny the existence of third parties selling restorations of its original recordings without its permission and responded that it was now investigating this conduct. (Pl.'s Mem. in Opp. to Def.'s Mot. to Dismiss at 15.) Capitol now submits the declaration of Peter Andry ("Andry"), the head of EMI's International Classical Division from 1969 to 1989, dated June 11, 2003, and the supplemental declaration of Richard C. Lyttelton ("Lyttelton"), the President of EMI's Classics and Jazz division since 1989, dated June 12, 2003.

Andry explains that EMI did not pursue third party infringers because "these companies were small and none of them represented a threat, let alone any significant threat." (Andry Decl. ¶ 4 ("No independent distributor of classical recordings was then remotely such a big force in the market as Naxos is today.).)" Furthermore, the companies' products were not as heavily discounted as those of Naxos. *Id.* "It was therefore felt that it would not have made commercial sense to start proceedings against these companies given that no commercial threat was posed. The cost of legal action would have been completely disproportionate given the commercial circumstances." *Id.* An additional factor cited by Lyttelton is that, except for Enterprise, the other companies cited by Naxos do not have dedicated U.S.-based wholesale importers or distributors, as does Naxos. Thus, "the commercial threat they pose to Capitol is minimal, especially in comparison with the continuing growth of Naxos' U.S. operations." (Lyttelton Supp. Decl. ¶ 7.)

However, Andry makes the point that some action was nonetheless taken with regards to the other third party infringers, and "[w]arning letters were often used to stop small companies carrying out infringing action or breaching the terms of existing license agreements." (Andry Decl. ¶ 5.) Capitol attaches such a letter sent to Moss Music Group Inc. on December 13, 1979. (Ex. 21.) Andry further informs that "a search for other warning letters is underway but . . . as at the date of this

---

4. In his declaration, dated February 6, 2003, Locantro later stated, "The expression of agreement in my October 16, 1986 letter to the 'general principles of the situation' pertaining to 'public domain' recordings as set out in Mr. Dewdney's 1978 letter, was limited to the legal status of such recordings in the U.K., and was not intended to address the status of such recordings in the United States, and I understood Mr. Dewdney's comments to be similarly limited." (Locantro Decl. ¶ 10.)

Declaration none have yet been located." (Andry Decl. ¶ 5.) Similarly, complaint letters were sent to Pearl whenever it issued recordings before they were 50 years old, and "a search for examples of such complaint letters is underway but . . . as at the date of this Declaration none have yet been located." (Andry Decl. ¶ 7.) However, if it is EMI's practice to send warning letters to all third party infringers, it is strange that after much investigation, EMI was only able to come up with one letter from 1979 and the "cease and desist" letter in the present case.

### b. *License Agreements*

Capitol further provided examples of license agreements pertaining to the U.S. distribution of sound recordings that were more than fifty years old and thus had entered the public domain in Britain. (Locantro Supp. Decl.; Ex. 19.) None of these agreements deal with the recordings at issue in this case. Capitol submitted agreements that are dated after the 1978 Dewdney letter, waiving EMI's rights to historical recordings out of copyright in Britain.

However, these agreements make no reference to the original shellac recordings, and it is much more likely that the licensees would use Capitol's own restorations. Dewdney's letter carefully differentiates between the original recordings in the public domain and "re-recordings" that may be "utilized for the borrower's personal use," but never for "public performance or broadcasting." Dewdney further explains that "the copyright in the music is a separate entity and presumably you are aware that any re-recording even for educational purposes must be cleared with the music rights owner."

Moreover, "[a] waiver to the extent it has been executed cannot be expunged or recalled." *Capitol Records*, 262 F.Supp.2d

at 211 (*quoting Nassau Trust Co. v. Montrose Concrete Prods. Corp.*, 56 N.Y.2d 175, 451 N.Y.S.2d 663, 668, 436 N.E.2d 1265 (1982)). As such, these letters are irrelevant.

### c. *EMI's Restorations*

Furthermore, as previously noted, EMI's own restorations of original recordings distributed in the United States claim ownership solely in restored versions of the performances and not in the underlying sound recordings.

### d. *Warren Reply Declaration*

Additionally, Capitol attaches a copy of the Reply Declaration of Mr. Richard Warren ("Warren"), the Curator of Yale University's Historical Sound Recordings Collection, executed on and dated February 12, 2003. Capitol explains that "the Court appears to have overlooked [this Declaration] in finding that the letters of EMI employees A.J. Dewdney and A.R. Locantro to Mr. Warren effected a waiver of EMI's rights in the Subject Works." (Levenson Decl. at 3.) The Reply Declaration was, however, not docketed and not part of the court file until the filing of the instant motion.

In his Reply Declaration, Warren complains that the Naxos Memorandum "mischaracterizes" his testimony in his initial January 21, 2003 Declaration. (Warren Reply Decl. ¶ 5.) This is irrelevant at this point since the May 6 Opinion relies on Warren's actual Declaration and not Naxos' characterization of it.

Warren further refuses to draw any legal conclusions from the EMI letters. He states, "I never understood EMI to have 'abandoned' or 'waived' any rights, and I am not privy to EMI's 'policy' with respect to historic sound recordings" (Warren Reply Decl. ¶ 9.); "I did not understand the

Letters to be a 'disavowal' of any of EMI's rights" (Warren Reply Decl. ¶ 11).

Additionally, Warren denies that Yale's collection serves as "a revenue-generating device." (Warren Reply Decl. ¶ 11.) He acknowledges that Yale "in certain circumstances charges a fee for access to historic recordings in its collection," but claims this fee is collected solely "to defray costs" and "is not charged for purposes of profit." *Id.* The May 6 Opinion states, "Yale currently charges publishers a fee in exchange for access to historic recordings where such access is for the purpose of restoration and commercial re-issue. Thus, as EMI is aware, Yale's collection serves as a revenue-generating side enterprise." *Capitol Records,* 262 F.Supp.2d at 211. It may be that the revenue collected by Yale is used only for the maintenance of Yale's collection, but the point is, as Warren admits, that Yale has generated funds from its historic collection, in the first place. This in no way contradicts that "Yale's collection is maintained for educational, historic and scholarly purposes." (Warren Reply Decl. ¶ 11.)

#### 4. *Royalties*

The Declaration of Duncan Moore ("Moore"), executed June 5, 2003, attests to EMI's payment of royalties to the performers. Moore states: "To the best of my knowledge, with the single exception noted below, EMI consistently paid all royalties due in connection with (a) sales of Subject Recordings worldwide through the copyright to each of those recordings expired, and (b) sales of the Subject Recordings in the United States to date." (Moore Decl. ¶ 4.) Moore explains that "Royalty payments on U.S. sales of the Casals recordings inadvertently ceased beginning in 1993 when EMI's royalty obligations in connection with European sales of these recordings ceased. This error was discov-

ered, corrected and retroactively cured in 2002, and royalty payments on U.S. sales of the Casals recordings consistently have been made since that time."

As an initial matter, Moore's statement is not supported by any documentation. Moreover, the exception Moore points to is rather significant since it spanned nine years, from 1993 to 2002. Capitol filed the present action against Naxos on October 2, 2002. It is further strange that EMI is continuing to make royalty payments with respect to the Menuhin and Fischer recordings since their agreements specify that royalties are only to be paid during the life of the performer. Fisher and Menuhin passed away on January 24, 1960 and March 12, 1999, respectively.

#### 5. *New Product*

Capitol further submits a declaration by their expert witness, Mr. Dennis Rooney ("Rooney"), a collector, producer, and consultant of historical recordings. Rooney declares that "the most successful transfer (or "restoration") is technically transparent, adding or subtracting nothing, and provides optimal conveyance of the particular sound recording from one medium to another. As new techniques become available to remove various faults inherent in the original recording medium (*i.e.,* noise, etc.), attaining that standard becomes easier." (Rooney Decl. ¶ 4.) He further explains, "A well-done transfer will doubtless be praised; however, the value of the original recording overrides interest in the transfer except to those in the profession or reviewers interested in audio techniques, and neither group constitutes a significant segment of the potential market for historical CD reissues." (Rooney Decl. ¶ 5.) "[B]ecause interest in the original recording is so much greater, it is incorrect to assert that, except as insofar it is physically unique in its appearance, sequence or

selection of items, what Naxos created was in any aesthetic sense 'a new product.'" (Rooney Decl. ¶ 6.) Rooney summarizes his opinion with the following three conclusions:

a. . . . Naxos's products are mere reissues and duplicate [sic] of the original Gramophone/EMI recordings.

b. In creating its reissues, Naxos appropriated the "commercial qualities" and "salable properties" of the original recordings from which they were transferred.

c. In distributing its reissues, Naxos is profiting "from the skill, expenditures, name and reputation of others," specifically the artists, recording personnel and Gramophone/EMI.

■■ As an initial manner, it is unhelpful for Rooney to testify as to legal conclusions by declaring the Naxos recordings new products and adopting legal language in his testimony. "Although an expert may opine on the ultimate issue of fact, she 'may not give testimony stating ultimate legal conclusions based on those facts.'" *Media Sports & Arts S.r.L. v. Kinney Shoe Corp*, 1999 WL 946354 at *1, No. 95 Civ. 3901(PKL), 1999 U.S. Dist. LEXIS 16035, at *4 (S.D.N.Y. Oct. 19, 1999) (*quoting United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir.1991)). This is the case because "[e]xpert evidence should not be permitted to 'usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it.'" *Primavera Familienstifung v. Askin*, 130 F.Supp.2d 450, 528 (S.D.N.Y.2001) (*quoting GST Telecomm., Inc. v. Irwin*, 192 F.R.D. 109, 110 (S.D.N.Y.2000)). However, testimony as to the process by which restorations are made is helpful.

As Rooney himself seems to recognize, a "successful" restoration is "transparent" in the sense of conveying the performance, not the recording, as accurately as possible.[5] Rooney thus cites the virtues of "new techniques" that enable the removal of "various faults inherent in the original recording medium (*i.e.*, noise, etc.)." (Rooney Decl. ¶ 4.) Rooney further goes on to claim that it is "highly debatable whether any reissue derived from shellac pressings can be absolutely superior to one produced from the original metal matrices ("plates")." (Rooney Decl. ¶ 8.) Here again, Rooney acknowledges that the superior restoration is not an identical copy of the shellac recording, but rather seeks to capture the performance in the best way possible. In this way, "inherent appeal resides" not in the shellac recording, but rather with the performance. (Rooney Decl. ¶ 5.) "Potential consumers desire to hear Casals play the Bach Suites, or Menuhin play the Elgar Concerto with the composer conducting, or Edwin Fischer play the Bach Well Tempered Clavier." *Id.*

Furthermore, Rooney recognizes as "unquestionably true" that "any carefully undertaken transfer will entail 'skill, technology and taste.'" (Rooney Decl. ¶ 6.)[6]

---

**5.** Naxos' expert, Mark Ober–Thorn, likewise testified, "In my opinion, a well-done audio transfer should not draw attention to itself, but rather should allow the performance to be heard with the greatest clarity." (Obert–Thorn Decl. ¶ 7.)

**6.** Naxos' experts further testify in detail how "accomplishing professional quality CD transfers of historical recordings is a formidable, value-added-process that requires significant time, high-end/cutting edge equipment and technology (and the skill to use such equipment and technology to produce high quality product), sound musicianship, and expertise in audio restoration ..." (Obert–Thorn Decl. ¶ 24; *see also* Ledin Decl.; Martson Decl.)

Thus, "[a] well-done transfer will doubtless be praised" and will receive marketplace compensation for its addition of value. (Rooney Decl. ¶ 5.)

In accordance with the May 6 Opinion, Rooney correctly notes that it is irrelevant that the shellac recordings are "commercially unsalable." *Capitol Records*, 262 F.Supp.2d at 210 ("Capitol is correct to claim that the original recordings need not be from 'commercially available sources' in order to receive ... protection."); (Rooney Decl. ¶ 7.) However, he then goes on to conclude that "Naxos appropriated the 'commercial qualities' and 'salable properties' of the original recordings from which they were transferred." (Rooney Decl. ¶ 9.) As the original shellacs lacked "commercial" and "salable" properties, Naxos would not stand much to benefit from such an appropriation.

Finally, although it is true that Naxos used the shellac recordings of the artists' performances in order to make its restorations, this is not a case of "unauthorized interference ... at precisely the point where the profit is to be reaped." *Metropolitan Opera Ass'n v. Wagner–Nichols Recorder Corp.*, 199 Misc. 786, 101 N.Y.S.2d 483, 490 (1950). Furthermore, Naxos never falsely advertised its restored products as duplicates of the original. *Fonotipia, Ltd. v. Bradley*, 171 F. 951, 964 (C.C.E.D.N.Y.1909) ("[W]here a product is placed upon the market, under advertisement and statement that the substitute or imitating product is a duplicate of the original, and where the commercial value of the imitation lies in the fact that it takes advantage of and appropriates to itself the commercial qualities, reputation, and salable properties of the original, equity should grant relief."). *See also Capitol Records, Inc. v. Greatest Records, Inc.*, 43 Misc.2d 878, 252 N.Y.S.2d 553, 554, 555 (1964); *Arista Records, Inc. v. MP3 Board*, No. 00

Civ. 4660, 2002 WL 1997918 (S.D.N.Y. Aug.29, 2002); and *Firma Melodiya v. ZYX Music GmbH*, 882 F.Supp. 1306, 1316 (S.D.N.Y.1995) (all cases where the recordings sold purported to be identical reproductions of the original). Similarly, the *Fame Publ'g Case*, which discusses the elements of tape piracy for recordings protected by the federal Copyright Act, stressed the identical nature of the recording and the lack of effort expended by the copier. It explained, no value is added by the copier, and "[t]he end product ... is not only 'similar' but virtually indistinguishable." *Fame Publ'g Co. v. Alabama Custom Tape, Inc.*, 507 F.2d 667, 669–70 (5th Cir.1975). Unlike these cases, as Rooney concedes, the Naxos restorations were not and did not intend to be identical reproductions of the shellac recordings, and their production entailed "skill, technology and taste." (Rooney Decl. ¶ 6.)

### 6. *Bad Faith*

As previously held, even with the extension of the doctrine of unfair competition to apply to misrepresentation, or "the selling of another's goods as one's own," as well as misappropriation, or "the palming off of one's goods as those of a rival trader," Naxos lacks the requisite bad faith. *Metropolitan Opera*, 101 N.Y.S.2d at 491. It neither attempted to sell its records as Capitol's, nor to sell Capitol's records as its own. It did not misappropriate Capitol's labor and expenditures, but rather sought to profit from its own efforts and ingenuity. It is irrelevant to the unfair competition claim whether or not Naxos knew that Capitol objected to its distribution of its restorations. Naxos believed—and continues to believe—that Capitol's objections are unjustifiable, as evidenced by its defense in this action.

### *Analysis in Light of Additional Facts*

■ The motion for summary judgment is granted. As previously held, the

facts are inadequate to support Capitol's claim of intellectual property rights in the original recordings. The English copyrights in the agreements have long since expired, there is ambiguity concerning Capitol's chain of title, and Capitol appears to have waived or abandoned any interests it had in the original recordings. Furthermore, Naxos did not compete unfairly under New York law. Naxos did not attempt to sell identical copies of the shellac recordings, employing effort and skill in making its restorations. Moreover, neither selling another's goods as its own nor palming of its goods as another's, Naxos lacked the requisite bad faith for an unfair competition claim.

### Conclusion

For the reasons set forth, Capitol's motion is denied, and summary judgment is granted in Naxos' favor.

It is so ordered.