UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2003

Argued: January 26, 2004 Decided: June 21, 2004

Docket No. 03-7859

- - - - - - - - - - - - - - -

CAPITOL RECORDS, INC.,
Plaintiff-Appellant,

v.

NAXOS OF AMERICA, INC.,
Defendant-Appellee.

- - - - - - - - - - - - - - -

Before: NEWMAN and RAGGI, Circuit Judges; and
UNDERHILL,[*] District Judge.

Appeal from the August 11, 2003, judgment of the United States District Court for the Southern District of New York (Robert W. Sweet, District Judge), dismissing, on motion for summary judgment, suit alleging common law copyright infringement of sound recordings, unfair competition, and other torts.

Question concerning New York common law copyright certified to New York Court of Appeals.

Philip Allen Lacovara, Mayer Brown Rowe & Maw LLP, New York, N.Y. (Paul R. Levenson, Kaplan & Levenson LLP, New York, N.Y., on the brief), for Plaintiff-Appellant.

Maxim H. Waldbaum, New York, N.Y. (Lora Moffatt, Lori D. Greendorfer, Joseph E. Petersen, Salans, New York, N.Y., on the brief), for Defendant-Appellee.

---

[*]Honorable Stefan R. Underhill of the United States District Court for the District of Connecticut, sitting by designation.

(Todd E. Fitzsimmons, Dale M. Cendali, O'Melveny & Myers LLP, New York, N.Y.; Matthew J. Oppenheim, Stanley Pierre-Louis, RIAA, Washington, D.C., submitted a brief for amicus curiae Recording Industry Association of America, in support of Plaintiff-Appellant).

JON O. NEWMAN, Circuit Judge.

This appeal concerns issues of common law copyright under New York law. The allegedly infringing works are restorations of sound recordings of important classical performances originally recorded in England in the 1930s. Plaintiff-Appellant Capitol Records, Inc. ("Capitol") appeals from the judgment of the District Court for the Southern District of New York (Robert W. Sweet, District Judge) dismissing its suit against Defendant-Appellee Naxos of America, Inc. ("Naxos"). We conclude that the appeal raises unsettled issues of state law that are appropriate for certification to the New York Court of Appeals.

Background

The original recordings and the artists' contracts. The recordings at issue ("the original recordings") are: Yehudi Menuhin's performance of Edward Elgar's "Violin Concerto in B minor, Opus 61," recorded on July 5 and 14, 1932, and Menuhin's performance of Max Bruch's "Violin Concerto No. 1 in G minor, Opus 26," recorded on November 25, 1931; Pablo Casals' performances of the J.S. Bach cello suites recorded between November 1936 and June 1939; and Edwin Fischer's performance of J.S. Bach's "The Well Tempered Clavier, Book

I," recorded between April 1933 and August 1934, and Fischer's performance of Bach's "The Well Tempered Clavier, Book II," recorded between February 1935 and June 1936. The parties are in agreement that all of the original recordings were made in the United Kingdom.

On March 24, 1931, Menuhin signed a contract with The Gramophone Company Limited ("Gramophone"), now known as EMI Records Limited ("EMI"), stating that Gramophone would be "the absolute owner of all rights in the Artiste's personal performance and all rights of any nature whatsoever in respect of the records made by the Artiste for the Company that the Artiste shall at any time possess in any country of the world where the [British] Copyright Act 1911 is not in force." On November 24, 1933, Fischer signed a contract with Gramophone that contained identical language. On November 29, 1936, Casals signed a contract with Gramophone stating that Gramophone would be "entitled to the sole right of production, reproduction, sale, use and performance (including broadcasting) throughout the world by any and every means whatsoever of the records of the works performed by the Artiste under this Agreement."

Yale Library-EMI correspondence. On December 11, 1978, Richard Warren, curator of historical sound recordings at the Yale University Library, wrote to A.W. Dewdney, manager of EMI's copyright department in England, to inquire about setting up a procedure to handle the many requests that the library received to copy historical EMI recordings. In the letter, Warren, while stating that he was not a legal expert, set out his understanding of the state of copyright law for historical

recordings. He wrote that recordings made before 1972 were covered by state copyright laws, which "seem to provide unlimited (and retroactive) protection to all recordings without provision for registration." He identified three categories of requests for copies of recordings that his library had received: (1) copies for personal use, (2) copies for broadcast, and (3) copies for reissue.

Dewdney replied ten days later. Explicitly cautioning that he was "not . . . conversant with American copyright law," he explained that in the United Kingdom a copyright exists in a recording for 50 years from the end of the year in which the recording was made. Dewdney stated that, within that term, re-recordings must be used for personal use and not for public performance or broadcasting, and no further copies can be made without the written permission of the owners of the rights in the recording. Beyond the 50-year term, no permission would be necessary for the three categories of uses identified in Warren's letter, so long as "the musical content is public domain."

On September 30, 1986, Warren wrote to A.R. Locantro, manager of licensing and repertoire exploitation for EMI, summarizing his correspondence with Dewdney. Locantro replied that he "fully agree[d] with the exchange of correspondence" between Warren and Dewdney "in that it correctly set[] out the legal situation pertaining to public domain recordings."

<u>EMI's licenses.</u> EMI also does business as EMI Records (U.K.), according to a declaration of Richard C. Lyttelton, president for

classics and jazz of EMI Recorded Music, a division of EMI. In April 1996, EMI Records (U.K.) and EMI Music International Services Limited ("EMIMIS") entered into a Matrix Exchange Agreement ("EMIMIS Matrix Agreement"), under which EMI Records (U.K.) granted to EMIMIS an exclusive license to exploit the original recordings in the United States. At the same time, EMIMIS and Capitol also entered into a Matrix Exchange Agreement ("Capitol Matrix Agreement"), under which EMIMIS exclusively licensed the same rights to Capitol.

The Naxos restorations and the lawsuit. In 1999, Naxos began to sell restorations of the original recordings ("the Naxos restorations") in competition with Capitol's restorations. In October 2002, Capitol sued Naxos for unfair competition, misappropriation of property, unjust enrichment, and common law copyright infringement. Naxos moved to dismiss for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6). Naxos submitted multiple declarations with its motion papers. Capitol responded by moving for partial summary judgment on liability, a permanent injunction, and an accounting. Capitol submitted its own set of supporting declarations and documents. Naxos responded with still more documents.

District Court opinions. The District Court issued two opinions in this case. The principal opinion, Capitol Records, Inc. v. Naxos of America, Inc., 262 F. Supp. 2d 204 (S.D.N.Y. 2003) ("Capitol I"), granted Naxos's motion for summary judgment, but gave Capitol time to submit additional factual material. See id. at 216. After receipt of

Capitol's submission, the Court issued a second opinion, Capitol Records, Inc. v. Naxos of America, Inc., 274 F. Supp. 2d 472 (S.D.N.Y. 2003) ("Capitol II"), which adhered to its prior ruling and expanded on some of the Court's reasoning.

In Capitol I, the Court first converted Naxos's motion to dismiss into a motion for summary judgment in view of the "well-developed factual record" in the case and because both parties had had ample opportunity to present relevant materials to the Court. 262 F. Supp. 2d at 207. The Court then noted the parties' agreement that the original recordings are not protected by federal copyright law because they are sound recordings "fixed before February 15, 1972." Id. at 209 (internal quotation marks omitted).[1] However, the Court recognized that the recordings would be covered by any applicable state common law protections until federal preemption occurs on February 15, 2067. Id.; see 17 U.S.C. § 301(c).

Rejecting all of Capitol's claims, the Court concluded that Naxos was entitled to summary judgment. Some aspects of the Court's ruling are not entirely clear. Initially, the Court viewed Capitol as asserting "a hybrid copyright, unfair competition cause of action," id. at 210, a designation that appeared to import the elements of an

[1]For the quoted phrase "fixed before February 15, 1972," the Court cited 17 U.S.C. § 104A(h)(6)(C)(ii), a provision of the Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994), concerning restoration of copyright in certain public domain works. However, that provision merely identifies one criterion of a class of works that are eligible for restoration of copyright. The provision that leaves sound recordings "fixed before February 15, 1972" unprotected by federal copyright law (but subject to protection under state law until February 15, 2067) is 17 U.S.C. § 301(c).

unfair competition claim into Capitol's claim of common law copyright infringement. Moreover, the Court at no point stated that Capitol did not have a common law copyright in the original recordings. But it did rule that "the facts are inadequate to support Capitol's claim of intellectual property rights in the original recordings," id. at 211, and then separately considered and rejected Capitol's claim of unfair competition, id. at 213-16.

In support of the conclusion that Capitol lacked intellectual property rights in the recordings, the Court gave both definitive and tentative reasons. First, the Court noted that the U.K. copyrights "have long since expired," id. at 211, apparently reflecting the Court's view that this fact alone defeated Capitol's claim for common law copyright infringement. The Court then stated that "there is ambiguity concerning Capitol's chain of title and the agreement with Casals." Id. (emphasis added). The ambiguity in Capitol's chain of title, as explained in Capitol II, derived from the fact that the EMIMIS Matrix Agreement was executed after the expiration of English copyrights in the original recordings, see 274 F. Supp. 2d at 474, and the fact that the first of Capitol's licenses to distribute EMI's recordings in the United States contained no reference to the transfer of rights from EMI to EMISIS, Capitol's alleged licensor, id. The ambiguity in the agreement with Casals was based on the assertion that in the agreement "there is no identified (UK) copyright holder because there is no specific mention of the ownership of the plate." Capitol I, 262 F. Supp. 2d at 211. The Court asserted that under U.K.

copyright law "the owner of any copyright interest in a sound recording depends upon ownership of the plate. Copyright Act, 1911, § 19 ('[T]he person who was the owner of such original plate at the time when such plate was made shall be deemed to be the author of the work.')." Id. After consideration of a submission by a lawyer familiar with recording industry practice, the Court acknowledged that a factual question precluded resolution on summary judgment of the ambiguity in the Casals agreement, but concluded that this issue was not dispositive. See Capitol II, 274 F. Supp. 2d at 475.

In Capitol I, the Court also stated that "Capitol appears to have waived or abandoned any interests it had in the original recordings." 262 F. Supp. 2d at 211 (emphasis added). After stating this last point tentatively, the Court then ruled that waiver and abandonment had occurred. Waiver was predicated on EMI's correspondence with the Yale library. See id. Abandonment was predicated on (1) the alleged fact that EMI's own restorations of the original recordings claim copyright solely in the restorations, not the underlying original works, (2) the Yale library correspondence, (3) Capitol's failure to pursue other companies selling restorations of the original recordings, and (4) the lack of clarity as to when and how consistently royalties had been paid. See id. at 212-13.

Turning to the claim of unfair competition in its first opinion, the Court initially rejected the claim on the ground that Capitol had no rights in the original recordings. See Capitol I, 262 F. Supp. 2d at 213. In addition, the Court pointed out that Naxos had not claimed

that its restorations were a "substitute" for or an "imitation" or "duplicate" of the original recordings. See id. In the Court's view, Naxos had "create[d] an entirely new and commercially viable product," id. at 214, in contrast to the original recordings, which were "marred by numerous sound imperfections," id. and could be played only on machines that had become obsolete and unavailable to most consumers, id. The Court also noted that public policy concerns, which had favored the plaintiff in New York cases such as Metropolitan Opera Ass'n v. Wagner-Nichols Recorder Corp., 199 Misc. 786, 101 N.Y.S.2d 483 (Sup. Ct. 1950), favored Naxos. "[T]he Naxos restorations would not discourage, but rather encourage 'the preservation and dissemination'" of 'fine performances,'" Capitol I, 262 F. Supp. 2d at 215 (quoting Metropolitan Opera, 199 Misc. at 802, 101 N.Y.S.2d at 497), and might have "revived the relevant market in historic classical performances to Capitol's benefit," id. Finally, the Court stated that Naxos had not shown the bad faith necessary for a common law claim of unfair competition. See id.

The Court's subsequent opinion elaborated on the waiver and abandonment rulings, but concluded with a repetition of the tentative nature of its view on these points: "Capitol appears to have waived or abandoned any interests it had in the original recordings." Capitol II, 274 F. Supp. 2d at 481 (emphasis added).

## Discussion

### I. Common Law Copyright

The District Court properly ruled, and the parties do not

dispute, that, because the original recordings were fixed before February 15, 1972, they are neither protected nor preempted by federal copyright law, and Capitol's copyright claim therefore depends on state law protection until federal preemption occurs on February 15, 2067.[2] See 17 U.S.C. § 301(c). The District Court and the parties have assumed, correctly in our view, that the relevant state law is that of New York, the jurisdiction where the alleged infringement occurred. See Itar-Tass Russian News Agency v. Russian Kurier, Inc., 153 F.3d 82, 91 (2d Cir. 1998). Since no New York statute provides a civil remedy for infringement of the copyright in a sound recording,[3] the availability of such a remedy depends on the scope of a common law copyright under New York's common law.

In looking to New York's common law, we need to make clear that the phrase "common law copyright" has a broader meaning as applied to sound recordings than it has as applied to most other forms of intellectual property. For most forms of intellectual property, a common law copyright was generally said to refer to an author's property right in his creation before publication. See Nimmer on

[2]The 1976 Copyright Act ended common law copyright protection for all works that are the subject of federal preemption. See 17 U.S.C. § 301(a); Nimmer § 2.02, at 2-18.

[3]New York provides criminal penalties for unauthorized "transfers" of sound recordings, see N.Y. Penal Law §§ 275.00-275.45 (McKinney 2000). Those provisions "shall neither enlarge nor diminish the rights of parties in civil litigation." Id. § 275.45(2). See also N.Y. Arts & Cult. Aff. Law § 31.01 (McKinney 1984) (civil and criminal penalties for unauthorized sound recordings of performance).

Copyright ("Nimmer") § 2.02, at 2-18 (2004).[4] Protection after publication was provided by federal statute.[5] Id. However, when the Supreme Court considered the scope of state law authority over copying

---

[4]As the New York Court of Appeals explained more than a century ago:

> The author of a literary work or composition has, by law, a right to the first publication of it. He has a right to determine whether it shall be published at all, and if published, when, where, by whom, and in what form. This exclusive right is confined to the first publication. When once published it is dedicated to the public, and the author has not, at common law, any exclusive right to multiply copies of it, or to control the subsequent issues of copies by others. The right of an author or proprietor of a literary work to multiply copies of it to the exclusion of others is the creature of statute. This is the right secured by the "copyright" laws of the different governments.
>
> . . . This common-law right "of first publication" is sometimes spoken of as "copyright before publication," while the right to multiply copies secured by statute is called in contra-distinction "copyright after publication."

Palmer v. De Witt, 47 N.Y. 532, 536-37 (1872). Since Palmer concerned an unpublished manuscript of a play (the published version of which enjoyed federal statutory protection), its reference to "the right to multiply copies secured by statute" has no current relevance to the right to multiply copies of sound recordings, which, as will be discussed, are subject to state law, both pre- and post-publication.

[5]The expansion of the categories covered by the federal statute, from "maps, charts, and books" in 1790, to the broad scope of the current statute, see 17 U.S.C. § 102, is chronicled in Goldstein v. California, 412 U.S. 546, 562 n.17 (1973). Because federal law provided exclusive protection for published works and because virtually all categories of works worth copying were brought within the scope of the federal statute as technology advanced, there was little occasion for state courts to consider whether their common law should be adapted to extend some form of post-publication protection to works not within the scope of federal protection, and federal courts also had no reason to consider whether the federal statute's specification of protected categories precluded state law protection for categories not federally protected.

of sound recordings,[6] which were not protected by federal statute until 1972, see Act of Oct. 15, 1971, Pub. L. No. 92-140, 85 Stat. 391, 391-92 (1971), the Court made clear that state authority was not limited to pre-publication protection. See Goldstein v California, 412 U.S. 546, 570 & n.28 (1973).[7] As the Court explained, federal law makes the concept of publication relevant only to federal copyright law, and states can determine for themselves whether publication has any relevance to copyright protection for works, such as pre-1972 sound recordings, to which Congress has not extended the federal copyright statute.[8] And, as we have noted, the preemption provision of the 1976

---

[6]The advent of technology for reproducing copies of the sounds of musical performances fixed on tape or records created the occasion for new state protection and for federal court challenge to such protection. Sound recordings were not within the scope of the federal statute until 1972, and then, as now, the federal protection extended only to recordings fixed after February 15, 1972. See Act of Oct. 15, 1971, Pub. L. No. 92-140, 85 Stat. 391, 391-92 (1971); 17 U.S.C. §§ 102(a)(7), 301(c). As record piracy became prevalent, it could be expected that state law would endeavor to provide protection for pre-1972 sound recordings and that federal law challenges would be brought to such assertions of state law. California subjected record piracy to statutory criminal penalties, and the validity of the statute was promptly challenged, ultimately in the Supreme Court. See Goldstein, 412 U.S. 546.

[7]Although the Court was considering state protection provided by a criminal statute, the Court stated a broad view of state authority over pre-1972 sound recordings: "California did not surrender its power to issue copyrights." Goldstein, 412 U.S. at 561.

[8]The Court stated:

> For purposes of federal law, "publication" serves only as a term of the art which defines the legal relationships which Congress has adopted under the federal copyright statutes. As to categories of writings which Congress has not brought within the scope of the federal statute, the term has no application.

Act explicitly preserved until 2067 state law authority over sound recordings fixed before February 15, 1972. See 17 U.S.C. § 301(c).

Thus, as a result of Goldstein and section 301(c), it is entirely up to New York to determine the scope of its common law copyright with respect to pre-1972 sound recordings. As to such recordings, "common law copyright" does not have only its traditional meaning of pre-publication protection, but means protection against copying without regard to publication. See Nimmer § 4.06[B], at 4-42.5 ("Until 2067, state law protection (via common law copyright or otherwise) for such pre-1972 sound recordings is not precluded by federal preemption under the current Act, regardless of whether or not such sound recordings have been published." (footnote omitted)). As far as federal law is concerned, a state court can develop post-publication protection for pre-1972 sound recordings.[9]

In the pending case, the District Court's ruling on common law copyright raises at least one and likely three issues on which the parties disagree and on which we are in doubt. The first and most clear-cut issue is whether the expiration of Capitol's copyright under U.K. law precludes any claim under New York's common law of copyright. The second issue is whether copyright infringement under New York common law requires some or all of the elements of the tort of unfair

---

Goldstein, 412 U.S. at 570 n.28.

[9]Although publication is not relevant to the existence of state law authority over sound recordings, we note that our Court has understood New York not to deem the public sale of records to be a publication. See Capitol Records, Inc. v. Mercury Records Corp., 221 F.2d 657, 663 (2d Cir. 1955).

competition. The third issue is whether a claim of copyright infringement under New York common law is defeated by showing that the allegedly infringing work is a "new product," either as a general matter or at least under the circumstances of this case.

(a) Expiration of U.K. copyright. The United Kingdom copyrights in the original recordings expired 50 years from "the making of the original plate," Copyright Act, 1911, 1 & 2 Geo. 5, c. 46, § 19, and, as the District Court ruled, all of the recordings have therefore entered the public domain in the U.K. The District Court apparently assumed that the expiration of the U.K. copyrights precluded any enforceable copyrights in the United States. That is not necessarily so. If we were dealing with works protected by the Berne Convention or the Universal Copyright Convention ("U.C.C."), that assumption would likely have been supported by the so-called "Rule of the Shorter Term."[10] See Nimmer § 17.10[A], at 17-54. However, neither the Berne Convention nor the U.C.C. applies to sound recordings. See Nimmer § 17.08[A], at 17-48.2. Such works are within the scope pf the so-called Phonogram Convention, see The Convention for the Protection of Producers of Phonograms Against Unauthorized Duplication of Their Phonograms ("Phonogram Convention"), Oct. 29, 1971, 25 U.S.T. 309, 866

[10] "No contracting State shall be obliged to grant protection to a work for a period longer than that fixed for the class of works to which the work in question belongs . . . in the case of published works by the law of the Contracting State in which the work has first been published." U.C.C. (Paris Text), July 24, 1971, art. IV(4)(a), 25 U.S.T. 1341; see Berne Convention for the Protection of Literary and Artistic Works (Paris Text), July 24, 1971, art. 7(8), S. Treaty Doc. No. 99-27 (amended 1979).

U.N.T.S. 67, but that Convention lacks a shorter term provision and, in any event, does not apply to phonograms[11] fixed prior to the date the Convention entered into force in a contracting state, see id. art. 6(3). For the United States, that date was March 10, 1974. See Nimmer app. 29, at 29-1.

Naxos contends that the expiration of the U.K. copyrights precludes enforceable copyrights in the United States by virtue of the Uruguay Round Agreements Act ("URAA"), Pub. L. No. 103-465, 108 Stat. 4809 (1994), particularly the provision of that Act that amends the 1976 Copyrights Act, see 17 U.S.C. § 104A. Section 104A restores copyright protection for certain works of foreign origin that lack copyright protection in the United States, including sound recordings fixed prior to February 15, 1972. However, the restoration of copyright does not apply to works that were in the public domain in their source country prior to January 1, 1996. See id. § 104A(h)(6)(B). Naxos contends that, because the restoration applies to works that are not in the public domain in the source country, i.e., works still protected by copyright in the source country, section 104A "reflects a Congressional policy of denying protection to works in the United States where such protection is denied in the country where the works originated." Br. for Defendant-Appellee at 21.

The Naxos argument is an example of the logical fallacy of

[11]"For purposes of this Convention: (a) 'phonogram' means any exclusively aural fixation of sounds of a performance or of other sounds." Phonogram Convention art. 1(a)

assuming that the inverse of a proposition is true.[12] See Raymond J. McCall, Basic Logic 125-26 (2d ed. 1952). An inverse statement of a proposition is possibly but not necessarily true. See id. That a work protected by a foreign copyright can have its United States copyright restored does not necessarily mean that a work unprotected by a foreign copyright cannot receive any protection in the United States. Indeed, it is highly unlikely that Congress would have impliedly repealed the state common law protection for sound recordings fixed prior to February 15, 1972, preserved by section 301(c), by adopting section 104A. Nothing in the legislative history of the URAA suggests such an outcome, and repeals by implication are disfavored. See Branch v. Smith, 538 U.S. 254, 273 (2003); Morton v. Mancari, 417 U.S. 535, 549 (1974). The restoration provision of section 104A extends federal protection to otherwise unprotected works within its coverage; it does not deny protection to works protected by common law copyright.

Thus, nothing in federal law denies Capitol enforceable rights in the original recordings simply because the U.K. copyrights have expired. By virtue of section 301(c), the extent of Capitol's copyrights, if any, depends entirely on the protection provided by New York's common law copyright.

No New York court has ruled whether a Rule of the Shorter Term would end a New York common law copyright for a work created in a

[12] In logic, the inverse of the proposition "All A's are B's" is "All non-A's are non-B's." See McCall at 125.

foreign country after the work has entered that country's public domain by reason of the expiration of the term of the foreign copyright. We have ruled that federal copyright law protects a work that enjoys no protection in the country where the work was created. See Hasbro Bradley, Inc. v. Sparkle Toys, Inc., 780 F.2d 189, 192-93 (2d Cir. 1985) (toy design, unprotected in country of origin, entitled to protection under United States law against infringement occurring in the United States). New York might choose to follow the principle of Hasbro and provide common law protection despite lack of United Kingdom protection, but it might also rule that common law protection ends in New York when protection ends in the country of creation. This latter view might regard Hasbro, even if analogous to New York's common law, as applying only to protection for a work never entitled to protection in the country of creation, as distinguished from protection for a work whose term of protection in the country of creation has expired. Such a view might also be predicated directly on a New York common law version of the Rule of the Shorter Term.

Lacking any guidance from the New York courts on the question whether a common law copyright remains available for a work that has entered the public domain in the country of creation, we will certify the question to the New York Court of Appeals.

(b) Copyright infringement and unfair competition. If New York common law does not terminate the copyright in a foreign sound recording upon expiration of the foreign copyright term, the next question concerns the elements of copyright infringement under New

York common law. Capitol contends that infringement requires only the same elements needed for a federal copyright claim: ownership of a valid copyright and copying. See Feist Publications, Inc. v. Rural Telephone Service Co., 499 U.S. 340, 361 (1991). Naxos contends that more is required, and appears to contend that the elements of unfair competition must be shown. "New York common law does not even recognize a cause of action for misappropriation of intangible rights unless such a claim is paired with a claim for unfair competition." Br. for Defendant-Appellee at 24 (citing Ippolito v. Lennon, 150 A.D.2d 300, 303, 542 N.Y.S.2d 3, 6 (1st Dep't 1989)).

The District Court appears to have substantially accepted Naxos's view of New York common law, referring to Capitol's common law claim as "a hybrid copyright, unfair competition cause of action." Capitol I, 262 F. Supp. 2d at 210.

In the absence of an authoritative ruling from the New York Court of Appeals, we are in substantial doubt whether New York would import elements of unfair competition into a cause of action for infringement of a common law copyright. Our certification will therefore include this question as well.

(c) Can a "new product" infringe a common law copyright? In the course of rejecting Capitol's cause of action for unfair competition, the District Court stated that Capitol's original recordings "are not even salable because time-worn shellacs are marred by numerous sound imperfections, and the types of machines which can extract sound from sound shellacs became obsolete many years ago and are unavailable to

the majority of consumers." Capitol I, 262 F. Supp. 2d at 214. The Court also ruled that Naxos "created and marketed a new product relying on its own labor, skill, and reputation." Id.

Although the Court's "new product" analysis was included in its rejection of Capitol's unfair competition claim, the Court's linkage of that claim to Capitol's copyright infringement claim implies, if not states, that the Court did not believe that a "new product" could infringe a common law copyright, at least where the allegedly protected work has little if any current market.

If federal copyright law applied, the Court's "new product" analysis would not defeat an infringement claim. As long as a defendant's work incorporates protectable elements of a plaintiff's work, the plaintiff is entitled to relief. See 17 U.S.C. § 103; Durham Industries v. Tomy Corp., 630 F.2d 905, 909 (2d Cir. 1980). Nor would the lack of a market for the protected work matter. For example, the proprietor of a copyright in a silent movie would have a viable infringement claim against a defendant who used an original screenplay of the silent movie (during the term of the movie's copyright) to remake the movie into a modern film with sound.

However, lacking guidance as to the contours of common law copyright infringement in New York, we cannot be certain whether the District Court's "new product" analysis would defeat a claim for common law copyright infringement, at least under the circumstances of this case. Our certification will therefore also include this question. II. Unfair Competition

Having linked Capitol's common law copyright claim to unfair competition, the District Court ruled that Naxos was entitled to summary judgment on Capitol's claim of unfair competition. Capitol I, 262 F. Supp. 2d at 213-16. This ruling was based not only on Capitol's lack of a protectable interest, resulting, in the Court's view, from the expiration of the U.K. copyright, but also on the absence of bad faith on the part of Naxos; the fact that Naxos "never falsely advertised its restored product as a 'duplicate' of the original, and . . . did not take advantage of the 'commercial qualities' and 'salable properties' of the original," id. at 213 (quoting Fonotipia Ltd. v. Bradley, 171 F. 951, 964 (C.C.E.D.N.Y. 1909)); and the Court's view that Capitol's original recordings were not salable and Naxos had created a "new product."

We agree that Capitol cannot prevail on a cause of action for unfair competition, unrelated to any copyright claim under state law. In affirming on this claim, we need go no further than to agree with the District Court that Capitol has not provided evidence to raise a genuine issue of material fact concerning bad faith on the part of Naxos. See Saratoga Vichy Spring Co. v. Lehman, 625 F.2d 1037, 1044 (2d Cir. 1980) ("Central [to an unfair competition claim] is some element of bad faith.").

III. Waiver and Abandonment.

The District Court's view of the Naxos claim that Capitol has waived or abandoned its rights in the original recordings is unclear. In the initial opinion, the Court stated that "Capitol appears to have

waived or abandoned" its interests Capitol I, 262 F. Supp. 2d at 211 (emphasis added), and also stated that Capitol "waived and abandoned" its rights, id. In the second opinion, the Court stated that EMI had "expressly disclaimed" its interests, Capitol II, 274 F. Supp. 2d at 475, and then concluded that Capitol "appears" to have waived or abandoned its interests, id. at 481.

Waiver. The waiver rulings, whether tentative or definitive, are based entirely on the two letters from EMI officials Dewdney and Locantro to a curator at the Yale Library. These letters, however, do not establish waiver. Dewdney specifically stated that he was "not . . . conversant with American copyright law." Under New York law, a claim of waiver requires proof of an "intentional relinquishment of a known right with both knowledge of its existence and an intention to relinquish it." Airco Alloys Division, Airco Inc. v. Niagara Mohawk Power Corp, 76 A.D.2d 68, 81, 430 N.Y.S.2d 179, 187 (4th Dep't 1980) (internal quotation marks omitted). Since Dewdney was unaware of the nature of EMI's rights under law (federal or state) in the United States, he could not have intended to relinquish a known right. Locantro's letter also gives no indication that it purports to waive any rights existing under common law in the United States. It simply agrees with Dewdney's views with respect to public domain works. Neither letter says anything about rights that might exist under state law copyrights.

Naxos contends that even if the Dewdney and Locantro letters do not establish waiver of common law rights in the United States, the

Yale curator's inquiry "should have prompted EMI to investigate protections for sound recordings under U.S. law" and that EMI's failure to investigate "satisfied the 'known right' requirement for a finding of waiver." Br. for Defendant-Appellee at 47. Naxos attempts to support this argument by citing Lauder v. First Unum Life Insurance Co., 284 F.3d 375 (2d Cir. 2002).

Lauder provides no support for Naxos. Lauder, an ERISA case, held that an insurer had waived a defense of which it had adequate information when it failed to investigate the facts concerning the defense and declined an insured's claim on the basis of a different defense. Id. at 380-82. Lauder noted that we had previously stated that "under the law applicable to insurance policies, an insurer may be barred from raising defenses not asserted in communications to the insured denying coverage." Id. at 380 (emphasis added) (quoting Juliano v. Health Maintenance Organization of New Jersey, Inc., 221 F.3d 279, 288 (2d Cir. 2000)) (internal quotation marks omitted). Lauder relied on our opinion in New York v. AMRO Realty Corp., 936 F.2d 1420 (2d Cir. 1991) for the proposition that "[a]n insurer is deemed, as a matter of law, to have intended to waive a defense to coverage where other defenses are asserted, and where the insurer possesses sufficient knowledge (actual or constructive) of the circumstances regarding the unasserted defense." Lauder, 284 F.3d at 382 (emphasis added) (quoting AMRO Realty, 936 F.2d at 1431) (internal quotation marks omitted). There is no comparable doctrine in copyright law, even if the Yale curator's inquiry created what might

have been considered in the insurance context a duty to investigate.

Abandonment. The District Court's abandonment rulings, whether definitive or tentative, are based on three circumstances. First, EMI's own restorations of the original recordings "claim copyright solely in the restored versions of the performances and not in the underlying sound recordings." Capitol I, 262 F. Supp. 2d at 212. Second, Capitol "has failed to pursue the many other companies presently selling restorations of the original recordings without any authority from Capitol." Id. Third, "it is unclear from the documentation of royalty payments, the length of time in which royalties were paid, or if they were consistently paid." Id. at 213 (emphasis added).

The parties agree that the District Court invoked the correct legal standard in stating that abandonment of copyright requires "(1) an intent by the copyright holder to surrender rights in the work; and (2) an overt act evidencing that intent." Id. at 211 (internal quotation marks omitted). Assuming that New York would apply this standard to abandonment of a common law copyright, we note that federal procedural law would normally render the issue of intent to abandon inappropriate for summary judgment. See Cline v. 1-888-Plumbing Group, Inc., 146 F. Supp. 2d 351, 364 (S.D.N.Y. 2001). In the pending case, the circumstances relied on by the District Court do not establish an intent to abandon to the degree of persuasiveness sufficient to warrant summary judgment. Indeed, it is far from clear that Naxos has produced enough evidence to create a genuine issue of

disputed fact concerning such intent.

First, the notices on EMI's restorations reserved "all rights," creating at least a factual issue as to whether those words applied only to the restorations, as Naxos claims, or to all of Capitol's rights, including rights in the underlying original recordings, as Capitol claims. More significantly, we find no indication that common law copyright in New York requires notice for protection, much less that the absence of notice indicates intent to abandon.[13]

Second, failure to pursue third-party infringers has regularly been rejected as a defense to copyright infringement or as an indication of abandonment. See, e.g., Paramount Pictures Corp. v. Carol Publishing Group, 11 F. Supp. 2d 329, 337 (S.D.N.Y. 1998).

Third, the non-payment of royalties was acknowledged by the Court to be "unclear," and payment has been unequivocally asserted by a senior EMI official. Moreover, it is by no means clear that some non-payment of royalties would indicate abandonment of common law copyright, as distinguished, for example, from some other plausible defense available to royalty obligors.

In sum, waiver has not been established, and abandonment is at least a factual issue that requires further exploration.

IV. Certification

What may well be the dispositive issue in this case--whether a common law copyright under New York law expires when the work enters

---

[13]Federal notice as a requirement was abandoned in 1988 for Berne era works. See 2 Nimmer § 7.02[B], at 7-14.

the public domain in the country of origin--has never been decided by any New York court, as far as our research discloses. The lack of a state law answer to what may prove to be a determinative question, as well as the absence of any indication of how New York would answer this question, weigh in favor of certification. On the other hand, we have indicated that certification is appropriate for questions "likely to recur," Kidney v. Kolmar Laboratories, Inc., 808 F.2d 955, 957 (2d Cir. 1987), and we cannot be certain that state law issues concerning copyright in sound recordings will recur. In addition, although a ruling that the common law copyright has expired would end this litigation, a ruling that U.K. public domain status does not terminate the common law copyright would leave some issues for subsequent determination, at least the factually disputed issue of abandonment. Normally, we would prefer to limit certification to issues that are necessarily dispositive of the litigation.

Recognizing that the New York Court of Appeals retains the ultimate decision on whether to accept certification, we conclude that we should certify in this case. The advent of modern technology to produce digitally enhanced reproductions of historic sound recordings makes it likely that a decision by the Court of Appeals will be important for this emerging field. And, since many original sound recordings were produced more than 50 years ago in the United Kingdom, the issue of whether public domain status there terminates common law copyright in New York can be expected to recur. We will therefore certify the following question:

“In view of the District Court’s assessment of the undisputed facts, but without regard to the issue of abandonment, is Naxos entitled to defeat Capitol’s claim for infringement of common law copyrights in the original recordings?" This overall question subsumes the following sub-questions: (1) "Does the expiration of the term of a copyright in the country of origin terminate a common law copyright in New York?" (2) "Does a cause of action for common law copyright infringement include some or all of the elements of unfair competition?" (3) "Is a claim of common law copyright infringement defeated by a defendant’s showing that the plaintiff’s work has slight if any current market and that the defendant’s work, although using components of the plaintiff’s work, is fairly to be regarded as a 'new product'?"

Although we would welcome the responses of the Court of Appeals to all of the sub-questions that we have identified within the overall question (and to any other aspects of state law that the Court of Appeals deems relevant to our case), we venture the view that if the Court of Appeals answers sub-question 1 in the affirmative, no further answers (and no further proceedings in the District Court) would be needed for our resolution of this appeal. As is our custom, see, e.g., Blue Cross and Blue Shield of New Jersey, Inc. v. Philip Morris USA Inc., 344 F.3d 211, 229 (2d Cir. 2003), we accord the Court of Appeals flexibility in reframing our overall and subsidiary questions if appropriate.

Conclusion

Accordingly, the Clerk will transmit to the New York Court of Appeals a Certificate containing this opinion with its identification of the principal question and sub-questions being certified, together with a complete set of the briefs, appendix, and record filed with this Court by the parties. After a response from the New York Court of Appeals, this panel will resume its exercise of jurisdiction over the appeal. The parties are hereby ordered to bear equally such fees and costs, if any, as may be requested by the New York Court of Appeals.